14 F.3d 605
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Craig M. YATTONI, Plaintiff-Appellant,
v.
OAKBROOK TERRACE, a municipal corporation; Detective
Michael DeLaurentis, Defendants-Appellees,
 No. 92-3727.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 1, 1993.
Decided Dec. 28, 1993.
 
 1
 Before POSNER, Chief Judge, CUMMINGS, Circuit Judge, and CRABB, District Judge[1].
 
 
 2
 We adopt Judge Shadur's comprehensive opinion granting summary judgment to defendants-appellees Oakbrook Terrace and Detective Michael DeLaurentis.
 
 
 3
 AFFIRMED.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE NORTHERN DISTRICT OF ILLINOIS
 EASTERN DIVISION
 MEMORANDUM OPINION AND ORDER
 
 4
 Police from the Chicago suburbs of Oakbrook Terrace and Waukegan arrested Craig Yattoni ("Yattoni") for crimes that he did not commit. Yattoni has sued both municipalities and the individual officers responsible for the arrests, claiming under 42 U.S.C. Sec. 1983 ("Section 1983") that the arrests violated his Fourth Amendment right to be free from unreasonable seizures.[1] Oakbrook Terrace and its Detective Michael De Laurentis ("DeLaurentis"), collectively "Oakbrook Defendants," now move for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, their motion is granted.
 
 Facts
 
 5
 Lori Nawa and her five-month old baby left the Venture store in Oakbrook Terrace at 9:30 p.m. on May 16, 1990.[3] She walked to her car and leaned over to put the baby in a carseat. As she did so a man approached her from the rear, put a knife to her chest and demanded her purse (O.D. 12(m) p 6). After he allowed Nawa to put the baby down, he grabbed the purse from her hand and ran (id. p 7 and Y. 12(n) p 7).
 
 
 6
 Nawa saw her assailant face to face during part of the robbery. She also saw him from the side as he took her purse, and she watched him as he ran toward his car (O.D. 12(m) p 8; Nawa Dep. 42). It is not clear how good a view of his face Nawa had as he fled. His car was "a couple lanes down" in the lot but was visible to Nawa because, like hers, it was parked under a light (id.).
 
 
 7
 Police arrived on the scene shortly. To them Nawa described her assailant as being between 25 and 30 years of age, 6' to 6' 3" tall, weighing 180 to 185 pounds, with receding reddish-blond hair, a thin build and fair skin (O.D. 12(m) and Y. 12(n) p 11). Interviewed the next day by DeLaurentis, Nawa recalled a slightly younger and marginally slimmer criminal: 170 to 180 pounds, aged 19 to 25, with "wavy" hair (O.D. 12(m) and O.D. 12(n) p 12).
 
 
 8
 DeLaurentis also showed Nawa some photographs of automobiles. She picked out a four-door white Dodge Aries K-car as most similar to her assailant's car. DeLaurentis and Officer Wayne Holakovsky ("Holakovsky") distributed a description of the robbery, car and offender to neighboring police departments by computer (O.D. 12(m) paragraphs 13-14).
 
 
 9
 On May 18 DeLaurentis accompanied Nawa to the DuPage County Sheriff's Department. There Nawa assisted a department artist in the preparation of an Identi-Kit sketch of the man who held her up. This time Nawa shaved a few more years off her assailant's age--he was now reported as 19 to 22, not 25, and only 6 feet tall. Otherwise her description of the man and the car was consistent with what she had told DeLaurentis the day before (O.D. 12(m) p 15; Yattoni Ex. 10).
 
 
 10
 At the time of the incident Yattoni did not quite conform to any of the varying descriptions. Instead he was 19 years old, 5' 10" tall and weighed 150 pounds (Y.Supp. 12(n) p 1).
 
 
 11
 Detective Ed Vaughan ("Vaughan") of Darien read a newspaper article about the Nawa holdup that included a description of the robber (Vaughan Dep. 76). On May 25 he called Holakovsky to relate that he was investigating the theft of a four-door white Plymouth Reliant, a car virtually identical to the K-car identified by Nawa. On May 19 an armed robber in Waukegan, with a physical description "similar" to the man who robbed Nawa, had used that stolen car to flee from a knifepoint robbery.
 
 
 12
 Indeed, the same car was reportedly used in other area crimes as well (O.D. 12(m) p 16(a), (b), (c), (e); Y. 12(n) p 16(c))--a series of crimes that this opinion will refer to as the "K-car robberies". Those crimes began with the theft of the white Plymouth Reliant from Darien on April 3, and they continued the same day with a theft from a store and a theft of gasoline (Y.Supp. 12(n) paragraphs 13-17). Next came the Nawa robbery on May 16. Armed robberies occurred in both Schaumburg and West Dundee the next day, followed by the Waukegan robbery on May 19 (id. paragraphs 18-20). Each of the three armed robberies involved a white K-car, a female victim and the use of a knife to force the surrender of property (id. p 21).
 
 
 13
 Vaughan told Holakovsky that he was investigating two suspects, Yattoni and Joseph Severino ("Severino"). In 1989 Yattoni and Severino had been involved in an auto theft with a third person whose family owned the white K-car now suspected of being used in the armed robberies. That earlier theft did not involve the white K-car (O.D. 12(m) and Y. 12(n) p 16(d)).
 
 
 14
 Holakovsky then obtained black-and-white photos of Yattoni and Severino from the DuPage County Sheriff's department. About June 1, 1990 DeLaurentis staged a photographic presentation at Nawa's house, showing her pictures of Yattoni and five other white males (O.D. 12(m) 18; DeLaurentis Dep. 42-43). Severino was not included in the photospread because his photograph was "substantially dissimilar" to the description given by Nawa (O.D. 12(m) p 18; DeLaurentis Dep. 126)--a point that Yattoni apparently admits, though he denies that his own photograph resembled the description (Y. 12(n) p 18).
 
 
 15
 At Nawa's house DeLaurentis produced a folder of pictures and sat quietly while Nawa studied them. She tentatively identified Yattoni as her assailant (Nawa Dep. 56):
 
 
 16
 But there was another guy that I was unsure of that maybe had some of the same, a few characteristics the same and I wasn't really a hundred percent sure. But I questioned it a little bit, but I had picked out Yattoni more. I said this [picture of Yattoni] looks like it but there's a little question that it was someone else.
 
 
 17
 Nawa complained that the black-and-white photos left her unable to judge hair color or skin tone. At DeLaurentis' suggestion she agreed to review a second photospread using color pictures (id. 56-57; O.D. 12(m) p 19).
 
 
 18
 Through the DuPage County State's Attorney, DeLaurentis then obtained a grand jury subpoena commanding Yattoni to appear at Oakbrook Terrace police headquarters for the taking of a color photograph. He and Holakovsky tried but failed to serve the subpoena on Yattoni at home on June 1 (O.D. 12(m) and Y. 12(n) paragraphs 21-22).
 
 
 19
 On May 31 Waukegan police obtained a warrant for Yattoni's arrest on charges resulting from the armed robbery in that community (Y.Supp. 12(n) p 37).[4] DeLaurentis agreed to serve the Waukegan warrant at the request of the Waukegan police (O.D. 12(m) p 23).
 
 
 20
 DeLaurentis says that he did not learn about the positive ID of Yattoni in Waukegan until June 1, nor did he learn about the Waukegan warrant until June 3 (Y. 12(n) p 31). But Yattoni claims that DeLaurentis knew about the Waukegan warrant before he obtained the grand jury subpoena for the color photo, "and had already agreed to execute the Waukegan warrant and work with Waukegan on this" (Y. 12(n) p 23). That argument is part of a larger attack on DeLaurentis' credibility, which is not properly resolved at this stage of the litigation.[5] Nothing in the record, however, suggests that DeLaurentis is lying about this particular issue.
 
 
 21
 On June 5 Yattoni voluntarily surrendered to the Oakbrook Terrace police on the Waukegan warrant. During Yattoni's processing DeLaurentis noted a physical resemblance to the description given by Nawa (O.D. 12(m) p 25[6].
 
 
 22
 Yattoni maintains that DeLaurentis put him through a rough one-on-one interrogation (Y.Supp. 12(n) paragraphs 46-50), which DeLaurentis denies. In particular, Yattoni says that DeLaurentis forced him to reveal his place of employment. DeLaurentis denies ever learning where Yattoni worked (DeLaurentis Dep. 121, 124, 177). But his own June 5 arrest report on Yattoni correctly says that Yattoni worked at Ejector Systems in Addison (Yattoni Ex. U). This opinion therefore credits Yattoni's version of the interrogation.
 
 
 23
 Yattoni also maintains that an officer from Schaumburg was present at the Oakbrook Terrace station (Y.Supp. 12(n) paragraphs 46-47). DeLaurentis admits that he knew about the Schaumburg robbery (DeLaurentis Dep. 90-91). But he does not recall talking to any officers from that town or seeing their report on a K-car robbery (id. 93), much less inviting a Schaumburg officer to observe Yattoni's booking. This opinion credits Yattoni's contention that the Schaumburg officer was present, creating the inference that DeLaurentis had communicated with the Schaumburg police to tell them that Yattoni might be their man.
 
 
 24
 At that time the Oakbrook Terrace police took color photos of Yattoni for use in a second photospread to be viewed by Nawa later that day (O.D. 12(m) and Y. 12(n) paragraphs 26-27). Nawa immediately identified Yattoni when she viewed the different photos (O.D. 12(m) p 28[7]). So far as is known, only Yattoni's photograph appeared in both photospreads. But the lack of any other repeat players evidently did not influence Nawa's selection at all (Nawa Dep. 58):
 
 
 25
 As soon as [DeLaurentis] put the folder out [Yattoni] stood out and then I looked at him first and then I saw all the others. So once I saw him, I didn't really study the other ones.
 
 
 26
 On June 8 a judicial warrant for Yattoni's arrest in the Nawa case was issued by a judge of the Circuit Court for DuPage County (Answer Ex. A). During the next 19 days DeLaurentis spoke with Yattoni's father several times. One of those conversations took place on June 15, the date of yet another K-car robbery in Arlington Heights. DeLaurentis told Yattoni pere that he knew Yattoni fils had not committed the Arlington Heights robbery (Y.Supp. 12(n) p 52; Yattoni Ex. J). He also confessed to "serious doubts" about the case against Craig (id.). It is unclear from the record whether that remark applied to the Arlington Heights robbery alone, the Nawa robbery or the whole spate of K-car robberies.
 
 
 27
 DeLaurentis does not even admit that the conversations with Lyle Yattoni took place. However, under Rule 56 this opinion must credit Yattoni's version, and it must also grant the reasonable inference that DeLaurentis doubted the strength of his own case against Yattoni.
 
 
 28
 At his deposition DeLaurentis repeatedly denied any knowledge of the Arlington Heights robbery before he executed the Oakbrook Terrace arrest warrant (DeLaurentis Dep. 95-96, 123). Yet Vaughan's records reflect a call from DeLaurentis on June 15, advising that he had just heard a radio report of the Arlington Heights robbery (Yattoni Ex. T). Arlington Heights police records also reflect a call about the incident from DeLaurentis (id. Ex. S at 18).
 
 
 29
 On June 27 Yattoni voluntarily surrendered on the Oakbrook Terrace arrest warrant (O.D. 12(m) and Y. 12(n) p 33). DeLaurentis explains the delay in executing the warrant by noting that he was sick for a few days; that he is the only detective in town and had other cases to handle; and that Yattoni's attorney had promised that Yattoni would turn himself in upon request (Y.Supp. 12(n) p 68; DeLaurentis Dep. 123). Yattoni spent half an hour at the station, posted bond and was released. His initial court date was set for July 16 (O.D. 12(m) and Y. 12(n) paragraphs 34-35).
 
 
 30
 Yattoni's luck then took a turn for the better. On July 8 police in Rolling Meadows arrested Michael Steele, who promptly confessed to the theft of the white K-car and to numerous robberies around the area--including the Waukegan and Nawa robberies that were the subject of the two arrest warrants (id. p 36). All charges against Yattoni were then dropped (id. paragraphs 37-39). Nonetheless Nawa sticks by her story that Yattoni and not Steele robbed her (id. p 40).
 
 Procedural History
 
 31
 Yattoni filed this action on June 3, 1---. Initially he sued Oakbrook Defendants as well as the City of Waukegan, its police officer Beatty ("Beatty") and its detective Moran (collectively "Waukegan Defendants"). Vaughan was also named as a defendant, though he was represented by separate counsel and thus is not included in the collective definition for purposes of this opinion. Waukegan Defendants then moved to dismiss the Complaint as it related to them. They argued for dismissal under Rules 12(b)(6) (failure to state a claim) and 12(b)(1) (lack of subject matter jurisdiction).
 
 
 32
 This Court issued a memorandum opinion and order rejecting the Rule 12(b)(1) motion (1991 WL 152525, 1991 U.S.Dist. LEXIS 10423 (N.D.Ill. July 26, 1991)). That opinion also noted several flaws in the Complaint that required a response by Yattoni before the Rule 12(b)(6) motion could properly be entertained.
 
 
 33
 On August 19, 1991 Yattoni filed a two-count Amended Complaint adding Waukegan Detective Lou Tessman to the roster of defendants. As for the new pleading's substantive claims:
 
 
 34
 1. Count I alleged that the individual defendants had violated Yattoni's Fourth Amendment right to be free from unreasonable seizures. That claim sounded in Section 1983.
 
 
 35
 2. Count II charged all defendants with the state-law torts of false arrest and malicious prosecution. There Yattoni invoked this court's supplemental jurisdiction to hear related state-law claims under 28 U.S.C. Sec. 1367 ("Section 1367").
 
 
 36
 Yattoni prayed for compensatory and punitive damages, costs and fees.
 
 
 37
 All defendants answered the Amended Complaint. Waukegan Defendants did not renew their Rule 12(b)(6) motion to dismiss, which Yattoni's new pleading had of course made moot. Oakbrook Defendants then filed the present motion for summary judgment, which is fully briefed and ripe for decision. Along the way the roster of defendants has shrunk by voluntary dismissals. Oakbrook Defendants now include the municipality and DeLaurentis but not Holakovsky. Waukegan Defendants now include the City and Tessman but not Beatty or Moran. Vaughan has also vanished from the case caption.
 
 Rule 56 Standards
 
 38
 Rule 56 requires this Court to rule in favor of Oakbrook Defendants as the moving parties if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." "Genuine" issues exist if the record evidence would permit a reasonable factfinder to adopt the view of the nonmoving party ( Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Old Republic Ins. Co. v. Federal Crop Ins. Corp., 947 F.2d 269, 274 (7th Cir.1991)). "As to materiality, the substantive law will identify which facts are material" ( Anderson, 477 U.S. at 248; see also Pritchard v. Rainfair, Inc., 945 F.2d 185, 191 (7th Cir.1991)).
 
 
 39
 Oakbrook Defendants as movants must establish the lack of a genuine issue of material fact ( Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). In deciding whether that burden has been met, this Court must draw "all reasonable inferences" in favor of Yattoni as the nonmoving party ( Allensworth v. General Motors Corp., 945 F.2d 174, 178 (7th Cir.1991)) and must resolve factual disputes in his favor as well ( Anderson, 477 U.S. at 255 ("evidence of the nonmovant is to be believed")).
 
 Probable Cause
 
 40
 Probable cause for an arrest by police officers exists if ( Beck v. Ohio, 379 U.S. 89, 91 (1964), quoted in Hunter v. Bryant, 112 S.Ct. 534, 537 (1991) (per curiam)):
 
 
 41
 at the moment the arrest was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing [that the defendant had committed a crime].
 
 
 42
 Courts determine the existence of probable cause by applying an objective standard. It is the mindset of the "reasonable officer" and not of the actual arresting officer that matters ( United States v. Reis, 906 F.2d 284, 289 (7th Cir.1990)).
 
 
 43
 Under Hunter, 112 S.Ct. at 536 a police officer's reasonable belief as to probable cause completely insulates the officer from liability under Section 1983 for the arrest of an innocent person. Hunter describes probable cause as a predicate for qualified immunity--the familiar doctrine that a state actor may be held liable under Section 1983 only if a reasonable person would have known that the actions in question violated the plaintiff's clearly established constitutional rights (112 S.Ct. at 536, citing Marlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).
 
 
 44
 However, Juriss v. McGowan, 957 F.2d 345, 349 n. 1 (7th Cir.1992) aptly notes that qualified immunity is something of a misnomer in this context, for the law in this area is simpler than the daunting doctrinal label of qualified immunity may suggest. Because a "reasonable ground for belief of guilt" supplies probable cause ( Brinegar v. United States, 338 U.S. 160, 175 (1949) (citations and internal quotation marks omitted), every arrest on probable cause is reasonable by definition. Only an "unreasonable" arrest can violate the Fourth Amendment, by the plain language of that provision. Hence a person arrested on probable cause cannot make out a prima facie case under Section 1983 ( Juriss, 957 F.2d at 349 n. 1).
 
 
 45
 This litigation gives no occasion to explore whatever subtle distinctions (if any at all) may exist between probable cause as grounds for immunity and probable cause as a substantive defense. DeLaurentis argues that he had probable cause. He did, as this opinion will establish. Therefore Yattoni has no case, however one slices and dices the doctrine.
 
 
 46
 Probable cause is a time-honored legal concept that can never be precisely defined. It is "less than a rule of more-likely-than-not, but how much less depends on the circumstances" ( Gramenos v. Jewel Cos., 797 F.2d 432, 438 (7th Cir.1986))--that is, on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" ( Brinegar, 338 U.S. at 175).
 
 
 47
 Analysis of the concept in those terms requires a recap of what DeLaurentis knew and when he knew it. His knowledge can be broken down into two relevant categories: evidence that Yattoni committed the Nawa robbery and evidence that Yattoni had committed the other K-car robberies.
 
 
 48
 1. Evidence that Yattoni committed the Nawa robbery: photospreads and Nawa's observation of Yattoni.
 
 
 49
 Before the arrest Nawa picked Yattoni out of two photospreads--tentatively the first time, but without doubt or hesitation the second time. DeLaurentis concedes that the first identification alone did not provide probable cause, but he contends that the second one (or rather the combination of the two) did.
 
 
 50
 Even a single identification by a reliable eyewitness or victim may be sufficient to supply probable cause ( Grimm v. Churchill, 932 F.2d 674, 675 (7th Cir.1991)). Photographic identifications in particular will suffice ( Smith v. City of Chicago, 913 F.2d 469, 473 (7th Cir.1990) (photo identification by victim, coupled with sworn complaint and victim's statement to judge, provides probable cause); United States v. Thweatt, 433 F.2d 1226, 1228 (D.C.Cir.1970) (photographic identification by two witnesses, including victim, provides probable cause without additional evidence needed)).
 
 
 51
 No deep thinking underlies that principle. Probable cause is a standard of reasonableness. When the victim points to a picture and cries, "That's the one!", the "reasonable and prudent" person hypothesized in Brinegar will naturally tend to believe that the person so identified is guilty.
 
 
 52
 It is possible of course, that a photospread or lineup is so unduly suggestive that it violates due process (see, e.g., Stovall v. Denno, 388 U.S. 293, 302 (1967)). That is somewhat oversimplistic, for an identification that bears the indicia of reliability may not violate due process--that is, it may be admissible--even if it results from an unduly suggestive photospread or lineup ( Neil v. Biggers, 409 U.S. 188, 199 (1972)). Yattoni argues both that the photospread procedure was tainted and that Nawa was unreliable. Neither argument is persuasive.
 
 
 53
 a. Tainted photospread? Any unduly suggestive lineup or photospread may confirm the police's prior suspicions about a person, but it is not likely to provide an unbiased reflection of the witness's personal knowledge. It therefore cannot provide objectively reasonable grounds for believing the defendant to be guilty. Like the magician who urges, "Pick a card, any card!", then identifies the unseen card as the ace of spades knowing that he has subtly forced that card on the unwitting member of the audience, the police cannot claim to have learned anything from a selection fore ordained by their own conduct.[8]
 
 
 54
 In this case only one source of unfairness is alleged: the repetition of Yattoni's photograph, but no other individuals' photographs, in the second layout. Yattoni argues that Nawa was certain to choose his picture the second time because his was the only face pictured in each of the two photospreads.
 
 
 55
 Simmons v. United States, 390 U.S. 377, 383 (1968) warns that the danger of misidentification is heightened when police "show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." But the Court hardly deemed photographic layouts, or any other form of eyewitness identification, to be per se unreliable--the draconian rule for which Yattoni Mem. 2-5 now appears to argue. Rather Simmons, 390 U.S. at 384 held that a conviction will be set aside:
 
 
 56
 only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
 
 
 57
 That lenient standard, though fashioned in an opinion that decided a direct criminal appeal, must also logically apply to a Section 1983 false arrest claim arising out of a photospread. It would make no sense to apply a stricter standard in a false arrest case than in a wrongful conviction case, where the intrusion on liberty has been so much great
 
 
 58
 It simply cannot be said here that the second photospread created "a very substantial likelihood of irreparable misidentification." DeLaurentis arranged the second layout to minimize the risk that Yattoni would be arrested in error. It was inevitable--in fact, it was the whole purpose of the exercise--that Yattoni's picture would recur in the second photospread. Simmons does not require the exclusion of an identification simply because the suspect's image is the only one to appear in consecutive lineups or photospreads ( United States v. Stevens, 935 F.2d 1380, 1392-93 n. 16 (3rd Cir.1991)). Instead Yattoni must show that "the totality of the circumstances" ( id. at 1391) created an undue risk of misidentification.
 
 
 59
 Yattoni might show, for example, that none of the other photographs in the second group resembled him at all. He might show that the non-Yattoni photographs in the second group resembled him, but that differed so dramatically from the non-Yattoni photographs in the first that his image must have leapt out at Nawa. He might show that the police displayed his photograph more prominently than the others or orally encouraged Nawa to select it. Or he might show that some agglomeration of minor errors, none so gross as the hypothetical ones just listed, combined to sway Nawa in a way that a neutral photospread would not have done.
 
 
 60
 But Yattoni has not even alleged (let alone offered evidence of) any such facts. Nor has he shown any facts from which this Court might draw the reasonable inference that the police skewed the procedure in some fashion. All that this Court can glean from the record is that a second photospread was presented--not in itself a suspect practice--and that Nawa selected Yattoni's photograph, without prompting, from among several that roughly matched her description of the attacker. Most importantly, Nawa has testified that she picked out Yattoni's photograph the second time without reference to the other photographs. Thus the second identification suffered from no constitutional infirmity.
 
 
 61
 b. Nawa's reliability. Nawa was under stress at the time of the robbery, a factor that concededly may distort a person's ability to recall her attacker's appearance ( Stevens, 935 F.2d at 1391). She also changed her description of the robber twice. None of the descriptions that she offered bears a precise resemblance to Yattoni.[9] Those factors add up, in Yattoni's view, to proof that the police could not reasonably have trusted Nawa's identification.
 
 
 62
 Reliability of an eyewitness identification is to be determined by considering the totality of the circumstances, with special reference to five factors ( Neil, 409 U.S. at 199-200):
 
 
 63
 the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
 
 
 64
 Applying those factors here, this Court determines that Nawa's identification of Yattoni was sufficiently reliable to supply probable cause for his arrest (see Mikel v. Thieret, 887 F.2d 733, 738-39 (7th Cir.1989)).
 
 
 65
 First, Nawa had the opportunity to look the robber full in the face during the crime, "under adequate artificial light" ( Neil, 409 U.S. at 200). As for the second factor, Nawa "was no casual observer, but rather the victim" of a violent crime (id.)--a factor that Neil deems significant.
 
 
 66
 In terms of the third factor, Nawa's descriptions of the assailant varied and did not precisely match Yattoni's physical characteristics. Yattoni was two inches shorter and 20 pounds lighter than the man described by Nawa. But the descriptions were roughly correct, and no more than rough accuracy is required under Neil.
 
 
 67
 Comparison of the Identi-Kit drawing with Yattoni's mug shot (Yattoni Ex. D) reveals at best a fair resemblance between the two. Like the man depicted in the drawing, Yattoni has a rather long face, high forehead and short, upswept, fair-to-medium-dark hair with a receding hairline. There are also significant differences between the two (the man in the drawing has wavy hair and arched eyebrows, while Yattoni's mug shot reveals straight hair and eyebrows that run straight across his forehead). As a whole, the drawing differed so much from Yattoni that it alone could not have supported a finding of probable cause (see, e.g., Fodelmesi v. Schepperly, 1992 WL 84469, at * 3-4, 1992 U.S.Dist. LEXIS 5041, at * 11-12 (S.D.N.Y. Apr. 15, 1992). But the differences were not so stark that they made reliance on Nawa's identification unreasonable.
 
 
 68
 Furthermore, Nawa's descriptions changed only in marginal detail. As a general rule there is no reason to distrust an identification simply because a witness's recollection changes in small ways over time. Here there was certainly no reason to distrust Nawa, for her final description turned out to be closer to Yattoni's actual appearance than her earlier ones.[10]
 
 
 69
 As for the fourth factor, it bears repeating that Nawa was absolutely sure of her identification at the second photospread. She testified at her deposition that she identified Yattoni without hesitation and without reference to the other photographs presented.
 
 
 70
 Finally, about two weeks elapsed between the crime and the first identification, and another two elapsed between the first identification and the second. True enough, a delay of "weeks or months between the crime and the viewing of the photograph" certainly tends to make an identification less reliable ( Manson v. Brathwaite, 432 U.S. 98, 116 (1977). But far greater intervals have not proved fatal in other ??--and in this situation any doubt cast by the delay must be outweighed by the other four factors, all of which cut in favor of permitting the police to rely upon the identification.
 
 
 71
 Nor does the fact that Nawa was distressed by the robbery affect the propriety of relying on her identification. All crime victims are upset. Yet the justice system does not automatically discredit the evidence they give. To the contrary: Thousands of Americans will sleep in prisons tonight because their victims testified against them. It is permissible to rely on a victim's testimony when it "seems reasonable to believe [the victim] is telling the truth," particularly when the person seems reasonably level-headed and gives a straightforward description of a crime just committed ( Gramenos, 797 F.2d at 439). There is no evidence to suggest that Nawa was so utterly distraught, so unable to observe or communicate, that the police acted unreasonably when they trusted her identification.
 
 
 72
 Even if the photospread had been tainted, then, under Neil Nawa's identification would still be admissible. And where no taint existed to begin with, Yattoni founders at each stage of the inquiry.
 
 
 73
 2. Evidence that Yattoni was guilty of all the K-car robberies: Nawa's identification of the car, and the Waukegan warrant.
 
 
 74
 Nawa had picked a white K-car out of the photograph book, similar to the one reportedly used in all the K-car robberies. That identification supported an inference that Yattoni had not only robbed Nawa but had committed the other K-car robberies, which bore a distinctive modus operandi. Furthermore, Yattoni was named in the arrest warrant for the Waukegan robbery.
 
 
 75
 But probable cause for the first warrant (assuming arguendo that probable cause did support the Waukegan warrant) cannot of itself supply probable cause for the second (the Oakbrook Terrace) warrant. Instead the latter warrant must rest on its own bottom--its own factual predicate.[11] Furthermore, by then DeLaurentis knew that Yattoni did not commit the Arlington Heights robbery. And the record reflects no evidence that might have led DeLaurentis to link Yattoni with the Schaumburg or Dundee robberies. Thus he could not reasonably have believed that Yattoni committed all the K-car robberies. Nawa's car identification and the Waukegan warrant were relevant only insofar as they linked Yattoni to those other crimes. They lend no support to DeLaurentis' probable cause arguments.
 
 
 76
 Here, in sum, is the situation. Several robberies are committed using the same modus operandi, in the same general area, within a few days of one another. Any detective--for that matter, any fan of detective fiction--would reasonably believe that one person committed all the robberies. Then a suspect is positively identified by the victim in Robbery # 1, providing probable cause to support the issuance of an arrest warrant for that robbery only. But other evidence exonerates the same person as a suspect in Robbery # 2. Does probable cause still exist to arrest the suspect for Robbery # 1? That question must be answered in the affirmative.
 
 
 77
 DeLaurentis arrested Yattoni for one crime on the basis of a positive identification by the victim. Proof of Yattoni's non-involvement in another crime did not directly undercut Nawa's identification. Nor did it cast such powerful circumstantial doubt on the identification as to render unreasonable DeLaurentis' belief in Yattoni's guilt based on that identification. After all, there were other logical explanations for the discrepancy besides Yattoni's total innocence. To name just one such explanation, there could have been two K-car bandits, working in cahoots but using the same stolen car.
 
 
 78
 Yattoni argues that DeLaurentis was fully aware of all the K-car robberies and investigations. But to grant that inference actually tends to make Yattoni's case even weaker. Descriptions of the criminal in the full range of incidents pegged his age at anywhere from 20 to 30, his weight at anywhere from 160 to 210, and his height at anywhere from 5'9" to 6'5" (Yattoni Ex. G). Thus if DeLaurentis really did share other police departments' knowledge of related incidents, he had ample reason to believe that more than one criminal was involved. It would follow that an exculpation of Yattoni in the Arlington Heights robbery would have little if any effect on the reasonable belief that Yattoni had committed the Oakbrook Terrace robbery.
 
 
 79
 In short, DeLaurentis' belief that Yattoni robbed Nawa was objectively reasonable as a matter of law, both on the day that he obtained the warrant and on the day that he executed it. This conclusion holds even if DeLaurentis had some nagging degree of internal doubt as to Yattoni's guilt in the Nawa crime. It also holds even if Yattoni were granted the inference that DeLaurentis initially suspected Yattoni of committing all the K-car robberies. DeLaurentis is therefore entitled to a summary judgment on Yattoni's Section 1983 claim.
 
 State Law Claims
 
 80
 No independent basis of federal jurisdiction now exists over Oakbrook Defendants that would entitle this Court to hear Yattoni's false arrest and malicious prosecution claims against them as an independent matter. However, Section 1367(a) now permits federal courts to adjudicate such state-law claims against parties not otherwise subject to federal jurisdiction so long as those claims:
 
 
 81
 are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
 
 
 82
 Here the record makes it clear that the Waukegan and Oakbrook Terrace police departments shared information and, to a certain extent, acted in concert with one another. Their actions can fairly be said to form part of the same Article III case or controversy, entitling this Court to retain jurisdiction over the Oakbrook Defendants as to the state-law claims.
 
 
 83
 But that merely leads to the inevitable dismissal of Yattoni's remaining claims. Burghardt v. Remiyac, 207 Ill.App.3d 402, 406, 565 N.E.2d 1049, 1052 (2d Dist.1991) (citations omitted) teaches:
 
 
 84
 The existence of probable cause is a complete defense to a malicious prosecution cause of action. An arrest under a judicially issued arrest warrant cannot give rise to a false imprisonment claim.
 
 
 85
 Probable cause is defined under state law just as it is under federal law (id.) As already stated, DeLaurentis had probable cause to obtain the warrant and to make the arrest. Thus the malicious prosecution claim must fail. And the issuance of the warrant defeats the false imprisonment claim as well. Oakbrook Defendants are entitled to a summary judgment on both state-law claims.
 
 Conclusion
 
 86
 This is a troubling case. Detective DeLaurentis emerges free of Section 1983 liability, but with an undeniable cloud cast over his credibility (see n. 5) as well as his policing skills. Yattoni has every right to be angry that DeLaurentis did not investigate more carefully before proceeding to arrest him. Police conduct that outrages those affected by it, however, does not necessarily offend the Constitution. Something worse than sloppy police work is required--a special degree of egregiousness, a level of utter carelessness and abuse of power not present on these facts--before Section 1983 can ease the victim's pain.
 
 
 87
 As to the Section 1983 claim, then, there is no genuine issue of material fact, and DeLaurentis is entitled to a judgment as a matter of law. DeLaurentis and Oakbrook Terrace are equally entitled to a judgment on Yattoni's state law claims. They are dismissed as defendants to this action.
 
 
 88
 Counsel for Yattoni and for Waukegan Defendants are ordered to appear for a status conference at 9:00 a.m. on September 30, 1992 to discuss the future course of this case. Counsel for Oakbrook Defendants are directed to appear at the same time to discuss the potential for entry of an order effecting the finality of their dismissal under Rule 54(b) (see, e.g., National Metalcrafters v. McNeil, 784 F.2d 817, 821 (7th Cir.1986)).
 
 
 89
 /s/ Milton I. Shadur
 
 MILTON I. SHADUR
 Senior United States District Judge
 Date: September 10, 1992
 
 
 [1]
 The Hon. Barbara B. Crabb, Chief Judge for the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Fourth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties)
 
 
 [2]
 Each party has filed the factual statement respectively required by this District Court's General Rule ("GR") 12(m)-(n) in conjunction with Rule 56 motions. Oakbrook Defendants' statement is cited as "O.D. 12(m)" and Yattoni's responsive statement as "Y. 12(n)." Yattoni has also filed an additional statement of facts, cited as "Y.Supp. 12(n)". Where a citation is to the same paragraph number in the two statements, it will take the form "O.D. 12(m) and Y. 12(n) p--."
 
 
 [3]
 All relevant dates are from 1990. Year designations are omitted hereafter
 
 
 [4]
 According to Yattoni, Waukegan police obtained that warrant by claiming that an eyewitness had positively identified him as the criminal. That eyewitness now denies ever identifying Yattoni (Yattoni Ex. W). Granting the pro-Yattoni inferences required on a Rule 56 motion, this opinion assumes that the Waukegan warrant was in fact tainted by police perjury. But nothing in the record suggests that DeLaurentis knew or should have known of any such flaw in the Waukegan warrant
 
 
 [5]
 This opinion rejects certain aspects of DeLaurentis' testimony because they are contradicted by documentary evidence. But this Court cannot and does not make any overall finding about his credibility. Summary judgment is not the proper vehicle for such a determination ( Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Black v. Lane, 824 F.2d 561, 562 (7th Cir.1987))
 
 
 [6]
 This citation refers to the second of two paragraphs numbered 25 in the O.D. 12(m) statement
 
 
 [7]
 Yattoni's irrelevant objections to this aspect of the O.D. 12(m) statement are ignored here
 
 
 [8]
 Neil, 409 U.S. at 199 states a sort of "reliability exception" to this general rule that is further discussed in the text below
 
 
 [9]
 Nawa also continues to insist even now that Yattoni robbed her, even though Steele has confessed to the crime. Such insistence, while puzzling, has no bearing on whether probable cause existed at the time of the arrest. At the time of the arrest DeLaurentis could not possibly have known that Nawa would persist in her mistaken identification when it became irrational to do so, thus casting doubt on the original identification
 
 
 [10]
 This aspect of the Neil analysis dovetails with the other piece of evidence linking Yattoni to the Nawa robbery: DeLaurentis' observation of Yattoni at the booking. DeLaurentis observed there the same resemblances that are noted here. Thus that observation reasonably contributed to his belief in Yattoni's guilt
 
 
 [11]
 Actual knowledge of the factual predicate for the first warrant might suffice under the right circumstances, but DeLaurentis had no such knowledge