36 F.3d 548
 30 Fed.R.Serv.3d 374
 Kerry L. MALTBY, Plaintiff-Appellee/Cross-Appellant,
v.
Marty WINSTON, Defendant-Appellant,
and
DeWayne Bond, Sheriff of Schuyler County, and West Central
Illinois Task Force, Defendants/Cross-Appellees.
 Nos. 92-1846, 92-1958 and 92-3447.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 28, 1994.
Decided Sept. 14, 1994.
 
 Daniel C. Lanterman (argued), Charles J. Gramlich, Gramlich Law Offices, P.C., Springfield, IL, for Kerry L. Maltby.
 Terence J. Corrigan, Asst. Atty. Gen., Office of The Attorney General, Criminal Appeals Div., Karen L. McNaught, Asst. Atty. Gen., Office of The Attorney General, Springfield, IL, Jan E. Hughes, Asst. Atty. Gen., Alison E. O'Hara (argued), Office of The Attorney General, Civil Appeals Div., Chicago, IL, for Marty Winston in Nos. 92-1846 and 92-3447.
 Randy E. Blue, Terence J. Corrigan, Asst. Attys. Gen., Office of The Attorney General, Criminal Appeals Div., Karen L. McNaught, Asst. Atty. Gen., Office of The Attorney General, Springfield, IL, Jan E. Hughes, Asst. Atty. Gen., Alison E. O'Hara (argued), Office of The Attorney General, Civil Appeals Div., Chicago, IL, for Marty Winston, West Cent. Illinois Task Force in No. 92-1958.
 Frederick P. Velde, Patrick J. Londrigan (argued), Heyl, Royster, Voelker & Allen, Springfield, IL, Karen L. Kendall, Heyl, Royster, Voelker & Allen, Peoria, IL, for DeWayne Bond in No. 92-1958.
 Daniel C. Lanterman (argued), Charles J. Gramlich, Gramlich Law Offices, P.C., Springfield, IL, Karen L. Kendall, Heyl, Royster, Voelker & Allen, Peoria, IL, for Kerry L. Maltby in No. 92-3447.
 Before CUDAHY and RIPPLE, Circuit Judges, and PLUNKETT,* District Judge.
 RIPPLE, Circuit Judge.
 
 
 1
 Kerry Maltby brought this action against Inspector Marty Winston, Sheriff DeWayne Bond, and the Central Illinois Task Force pursuant to 42 U.S.C. Sec. 1983 for violations of his rights secured by the Fourth Amendment as made applicable to the states through the Fourteenth Amendment. All of the defendants moved for judgment as a matter of law. The district court entered judgment in favor of Sheriff Bond, but denied such relief to the Task Force and to Inspector Winston. The question of liability went to the jury; it found that Inspector Winston had violated Mr. Maltby's rights and was not entitled to qualified immunity. The jury, however, returned a verdict in favor of the Task Force. Officer Winston now appeals. Mr. Maltby cross-appeals the district court's judgment as a matter of law in favor of Sheriff Bond and the jury's verdict in favor of the Task Force. For the reasons that follow, we affirm in part and reverse in part.I
 
 BACKGROUND
 A. Facts
 
 2
 The West Central Illinois Task Force ("Task Force") is a multijurisdictional law enforcement agency comprised of various rural police and sheriff's departments. The Task Force is organized pursuant to the Illinois Constitution and to the Intergovernmental Cooperation Act, 5 ILCS 220/1, which allow local governmental entities to pool resources. The purpose of the Task Force is to combine resources to combat more efficiently increased drug trafficking through both covert and overt operations. Any local department that wishes to join the Task Force is required to donate the services of one officer and a working car. The Task Force is directed by a Review Committee composed of the head officers from the participating agencies. It receives assistance from the Illinois Department of Criminal Investigation ("DCI"), which provides the Task Force with a facility to house the unit, training programs, equipment, and inspector status for its officers. Sheriff DeWayne Bond of Schuyler County desired to participate in the Task Force. He assigned one of his deputies, Marty Winston, to the Task Force.
 
 
 3
 On June 4, 1987, the Task Force conducted a covert drug investigation. Inspector Winston received a tip from a confidential source that a man named Kerry Maltby would be at the Dairy Queen in a brown Ford and would be prepared to sell narcotics. The source of this information was Anthony Hankins, who had become an informant of the Task Force two months earlier. When Inspector Winston had inquired, the DCI had informed him that Hankins was considered a reliable informant. Hankins had provided information to the Task Force on purchases of look-alike substances[1] and, as a result of these dealings, Inspector Winston considered Hankins reliable. With respect to this purchase, Hankins called Inspector Winston and told him that he had set up a drug purchase for six o'clock that evening. Hankins further informed Inspector Winston that the name of the seller was Kerry Maltby and that Hankins knew Mr. Maltby personally. In response to this information, the Task Force organized a surveillance team to monitor the undercover drug purchase.
 
 
 4
 At 5:45 p.m., Sergeant Gerald Kempf and Inspectors Winston and Bushon observed Inspector Sage pick up Hankins in Inspector Sage's undercover vehicle. Inspector Sage then advised the agents that he and Hankins were to meet Mr. Maltby at the Dairy Queen parking lot, and that Mr. Maltby was going to be driving a brown Ford. Inspector Winston, from a distance of approximately 200 feet, observed the undercover vehicle pull into the parking lot next to a brown Ford with a man in the driver's seat. Inspector Sage left his car and went over to the brown Ford. Hankins introduced the person in the Ford as Kerry Maltby. Inspector Sage then purchased what purported to be LSD from Mr. Maltby and also inquired about purchasing marijuana. During the entire transaction, which lasted approximately thirteen minutes, Mr. Maltby did not leave his car. After the transaction, the brown Ford left the parking lot and drove past Inspector Winston at between 15 and 25 miles per hour and at a distance of approximately thirty feet. The agents did not arrest Mr. Maltby after the transaction because they hoped to conduct more drug transactions with him. Inspector Winston later discovered that the brown Ford driven by the seller was registered to a Virgil Riley of Beardstown.
 
 
 5
 Sometime after this transaction, a suspect involved in prior marijuana purchases set up by Hankins contacted Inspector Sage to arrange a purchase. This suspect, Chestnut, told Inspector Sage that he intended to split the money from the proposed sale with Hankins. Receiving the proceeds from any drug transaction would have violated Hankins' informant agreement with the Task Force. Inspector Winston confronted Hankins with Chestnut's intention to split the money and, consequently, Hankins did not participate in any more transactions with the Task Force; indeed, he left town for a period of time.
 
 
 6
 Because Hankins was no longer available to set up undercover drug purchases from Mr. Maltby, the possibility of further purchases from the source evaporated. Inspector Winston therefore brought Mr. Maltby in for questioning regarding the Dairy Queen incident with the purpose of trying to persuade Mr. Maltby to become an informant. At the meeting, Mr. Maltby denied knowledge of the Dairy Queen transaction and declined to be an informant.
 
 
 7
 About a week later, after consulting with the supervising officer for the Dairy Queen transaction, Sgt. Kempf, Inspector Winston provided information on the Dairy Queen incident to the prosecutor, Alesia McMillen, in order to obtain a warrant for Mr. Maltby's arrest. The prosecutor in turn presented the information to a state circuit court judge. The judge issued a warrant for Mr. Maltby's arrest, and he was arrested the following day.
 
 
 8
 On August 12, Mr. Maltby appeared for a preliminary hearing. At the hearing, the prosecutor, as was her practice, called only one officer to testify to establish probable cause. Inspector Winston testified that he got a good look at the man who sold Inspector Sage the purported LSD and that the man was Mr. Maltby. Mr. Maltby's counsel cross-examined Inspector Winston on his view of the suspect but, for strategy reasons, called no witnesses on Mr. Maltby's behalf. There were, however, three alibi witnesses at the hearing prepared to testify. After the hearing, defense counsel advised the prosecutor of the alibi witnesses. Prosecutor McMillen then requested Inspector Winston to check out the witnesses' statements in preparation for trial. The parties met again on October 1 for a pretrial conference. At this time, Mr. Maltby declined a plea bargain and the case proceeded to trial.
 
 
 9
 Sheriff Bond was the person who transported Mr. Maltby from the jail to the courthouse for these hearings. During one of Mr. Maltby's trips to the courthouse, it is not clear which one, Mr. Maltby told Sheriff Bond that the authorities had the wrong person. As a precaution, Sheriff Bond called Task Force headquarters to make sure that Mr. Maltby had been identified by the undercover officer.
 
 
 10
 On October 6, in preparation for trial, Inspector Winston asked that Inspector Sage view a mug shot of Mr. Maltby. The photograph, however, was of poor quality, and Inspector Sage requested to view the suspect in person. Inspector Sage and Inspector Winston then went to the Fulton County Jail. After viewing Mr. Maltby for three seconds, Inspector Sage told Inspector Winston that Mr. Maltby was not the man from whom he had purchased the look-alike substance in the Dairy Queen parking lot. Inspector Winston notified the prosecutor of Inspector Sage's lack of identification. The prosecutor telephoned the judge and he authorized her to contact the jail for Mr. Maltby's immediate release.
 
 B. District Court Proceedings
 
 11
 Mr. Maltby brought this suit against Inspector Winston, Sheriff Bond, and the Task Force for violating his civil rights. At the close of plaintiff's case, all of the defendants moved for judgment as a matter of law.[2] The court granted Sheriff Bond's motion:
 
 
 12
 [T]here is no way that a verdict against Sheriff Bond, qua sheriff, could stand. Absolutely none. There is not any evidence in this record that ties him directly into any of the actions upon which Mr. Maltby could have a cause of action.
 
 
 13
 R.610. The district court denied the motion with respect to the Task Force and Inspector Winston. Counsel for Inspector Winston then reminded the court that Inspector Winston had claimed the defense of qualified immunity. The district court assured counsel that the question was still "viable."[3]
 
 
 14
 After the defendants presented their evidence, the court instructed the jury on qualified immunity and probable cause.[4] The jury returned a verdict for Mr. Maltby against Inspector Winston. However, it exonerated the Task Force. Inspector Winston then moved for judgment as a matter of law or in the alternative for a new trial. The court denied these motions. After hearing evidence on damages, the jury awarded Mr. Maltby $50,000 in compensatory damages and $2,300 in punitive damages. Later the court awarded Mr. Maltby attorney's fees.
 
 
 15
 Inspector Winston now appeals. He asserts numerous errors in the district court's decision--primarily that it erred in denying him qualified immunity. He also contends that the district court abused its discretion in admitting certain expert testimony, and that the district court erroneously instructed the jury. Mr. Maltby cross-appeals the court's judgment for Sheriff Bond and the jury verdict in favor of the Task Force. He maintains that the court erred when it denied him certain discovery requests and when it instructed the jury.
 
 II
 ANALYSIS
 
 16
 Although the parties present many issues for our consideration, we address only those the resolution of which is necessary to a decision in the appeal before us.
 
 A. Inspector Winston's Qualified Immunity
 
 17
 We begin our evaluation of the qualified immunity issue by setting forth Mr. Maltby's allegations against Inspector Winston. In his complaint, Mr. Maltby alleges the following actions on the part of Inspector Winston:
 
 
 18
 18. The misidentification of the Plaintiff by the Defendant Marty Winston and Defendant Marty Winston's subsequent failure to investigate and/or [c]onsult with others regarding Plaintiff's claim of misidentification exhibits malice, gross negligence, wilful and wanton misconduct and/or reckless disregard for the constitutional rights of the Plaintiff.
 
 
 19
 19. Defendant, MARTY WINSTON, knew or should have known that his actions and omissions would cause a depravation [sic] of Plaintiff's constitutional rights or were substantially certain to cause a depravation [sic] of Plaintiff's constitutional rights.
 
 
 20
 R.33. Although Mr. Maltby includes in his complaint allegations of failure to investigate, the jury never was instructed whether these actions could result in liability. Mr. Maltby does not challenge the adequacy of these jury instructions on appeal. The jury was instructed only that Inspector Winston's arrest without probable cause could result in liability.[5] Because absence of probable cause for the arrest was the only ground of recovery presented to the jury, Inspector Winston must show entitlement to qualified immunity only on this ground in order to prevail.
 
 
 21
 Generally speaking, "government officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "[T]he issue of qualified immunity is a legal question for the trial court, not the jury.[6] Although the qualified immunity determination is a legal question it is not answered in the abstract but in reference to the particular facts of the case." Rakovich v. Wade, 850 F.2d 1180, 1201-02 (7th Cir.) (en banc), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). In order for the plaintiff to prevail, it is not enough to recite a well-known constitutional principle and state that the actions taken by the officer violated that principle. Instead,
 
 
 22
 [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the previous action has been held unlawful, but it is to say that in the light of the preexisting law the unlawfulness must be apparent.
 
 
 23
 Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). As this court explained in a later review of Supreme Court authorities:
 
 
 24
 The Supreme Court found too general the appellate court's finding that it had been clearly established that the fourth amendment prohibited warrantless searches of a home absent probable cause and exigent circumstances. Instead the proper inquiry, the Court held, was whether "it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances."
 
 
 25
 ....
 
 
 26
 These examples indicate "that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." "Before a right is 'clearly established' it must be 'sufficiently particularized to put potential defendants on notice that their conduct is unlawful.' "
 
 
 27
 Rakovich v. Wade, 850 F.2d at 1208-09.
 
 
 28
 The Supreme Court has, on two occasions, applied this standard to false arrest situations. In Malley v. Briggs, 475 U.S. 335, 337, 106 S.Ct. 1092, 1094, 89 L.Ed.2d 271 (1986), the Supreme Court determined the level of immunity afforded to police officers when it is "alleged that the officer caused the plaintiffs to be unconstitutionally arrested by presenting a judge with a complaint and a supporting affidavit which failed to establish probable cause." The Court rejected a claim by the defendant police officers that "policy considerations require absolute immunity for the officer applying for a warrant." Id. at 341, 106 S.Ct. at 1096. The Supreme Court explained that "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... [If] officers of reasonable competence could disagree on this issue, immunity should be recognized." Id. The Court then framed the test accordingly: "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Id. at 345, 106 S.Ct. at 1098. Similarly, we have recognized that
 
 
 29
 Malley ... created room for an immunity defense even in cases where there was no probable cause for the arrest, by holding that "if officers of reasonable competence could disagree" on whether there was probable cause, the defendant would be immune from damages liability. In other words, only if no reasonable officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited.
 
 
 30
 Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir.1988) (citations omitted). This analysis recently has been reinforced by the Supreme Court in Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). In Bryant, the court reiterated that "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to [qualified] immunity." Id. 502 U.S. at ----, 112 S.Ct. at 536.
 
 
 31
 We therefore turn to the case before us: Was Inspector Winston presented with a situation in which no reasonable officer could have believed that he had probable cause to arrest Mr. Maltby? Although the standard of review is certainly not outcome-determinative, we believe that the issue of whether a constitutional right, in this case the right to be free from arrest without probable cause, is clearly established in a sufficiently particularized manner is a question of law we review de novo. Sherman v. Four County Counseling Ctr., 987 F.2d 397, 401 (7th Cir.1993).[7] In analyzing this question, we look to the facts that Inspector Winston knew at the time that he applied for the warrant. We evaluate whether "the facts and circumstances within the officer['s] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." Hughes v. Meyer, 880 F.2d 967, 969 (7th Cir.1989), cert. denied, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990). "Probable cause requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." Id.
 
 
 32
 Looking at what was known to Inspector Winston at the time he applied for the warrant, the following facts support a finding that Mr. Maltby was the person who sold the look-alike substance to Inspector Sage: Hankins' identification, prior to the Dairy Queen incident, that the man selling the drugs would be Kerry Maltby; Hankins' information that the seller would be arriving in a brown Ford; Inspector Winston's observation of a male parked in a brown Ford in the Dairy Queen parking lot; Hankins' introduction of the man in the Ford as "Kerry"; Inspector Winston's observation of the undercover purchase; Inspector Winston's observation of the man in the Ford driving past his surveillance position; Inspector Sage's report of purchasing 1.1 grams of LSD from Kerry Maltby; and Inspector Winston's viewing of Mr. Maltby face-to-face after the incident. We believe that these factors would lead a reasonable officer to believe that a crime had been committed and that Mr. Maltby was the perpetrator.
 
 
 33
 There were also factors, however, that came to light after the transaction, that weighed against a finding that Mr. Maltby was the person involved. First, Hankins, the confidential informant, left town after being confronted with information that he was engaging in illegal activity. Second, the brown Ford was not registered to Mr. Maltby, but to a Virgil Riley. Finally, when Mr. Maltby was questioned about the incident, he denied all knowledge of the transaction. Nevertheless, we believe that, even in the face of these circumstances, a reasonable officer could have believed he had probable cause. Hankins' reliability had been called into question generally; however, his information regarding the Dairy Queen transaction had been corroborated, to a great degree, by the officers who witnessed the transaction. Furthermore, the fact that the brown Ford used during the transaction was not registered to Mr. Maltby also did not negate probable cause; as Inspector Winston explained, those participating in drug transactions often use cars belonging to other people. Finally, Mr. Maltby's denial of involvement certainly could not make Inspector Winston's actions unreasonable; those accused of crimes more often than not deny, at least initially, their involvement.
 
 
 34
 As we have said previously, "[p]olice officers are entitled to qualified immunity if a reasonable officer, in applying for a warrant, could have believed that there was probable cause to support the application." Schertz v. Waupaca County, 875 F.2d 578, 583 (7th Cir.1989). An officer who had witnessed a purported drug transaction and who had made an identification of the seller could easily rationalize the shortcomings of the evidence; such a lapse at most reveals a mistake in judgment. The Supreme Court has stated: "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " Hunter, 502 U.S. at ----, 112 S.Ct. at 537 (quoting Malley, 475 U.S. at 341, 106 S.Ct. at 1096).
 
 
 35
 Mr. Maltby points to evidence that came to Inspector Winston's attention after the arrest. For example, Mr. Maltby notes that there was testimony at trial by his defense counsel that Inspector Winston agreed to verify Mr. Maltby's identification after the preliminary hearing. Tr. 396. However, the probable cause determination is made " 'at the moment the arrest is made.' " Hunter v. Bryant, 502 U.S. 224, ----, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (citations omitted); see also Gramenos v. Jewel, 797 F.2d 432, 439 (7th Cir.1986) (stating that "it's what the police know, not whether they know the truth, that matters"), cert. denied, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987). Any evidence, therefore, that came to light after the arrest is not relevant to the probable cause inquiry. Furthermore, we note that, as stated above, the jury was instructed that a violation of constitutional rights may be found only if the officer lacked probable cause at the time of the arrest. On the record before us, no instruction was proffered with regard to a continuing obligation.
 
 
 36
 Mr. Maltby also points to the fact that Inspector Winston did not inform the prosecutor of Hankins' disappearance prior to the preliminary hearing. Mr. Maltby submits that, because of this omission, Inspector Winston is not entitled to qualified immunity because he intentionally misled the prosecutor and the judge. See Whitley v. Seibel, 613 F.2d 682, 686 (7th Cir.1980) (stating that an officer who "intentionally misleads those who do have the ultimate authority to authorize the arrest ... may be found to have deprived the arrestee of his liberty without due process of law"), cert. denied, 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982).[8] However, whatever Hankins' shortcomings, his information with regard to this transaction largely had been corroborated.[9] Consequently, the fact that Hankins' general reliability had been called into question by his flight would have had little, if any, bearing on the outcome of the preliminary hearing or on the prosecutor's decision to pursue the case.[10]
 
 
 37
 It was incumbent upon Mr. Maltby to prove that it was readily apparent to Inspector Winston, given the law of probable cause in existence at the time, that his actions were unlawful.[11] Thus, we believe that a reasonable officer in Inspector Winston's position, looking to our case-law on probable cause generally, could have concluded that Mr. Maltby committed the crime. Consequently, Inspector Winston is entitled to qualified immunity.[12] We therefore reverse the judgment entered against him.
 
 B. Mr. Maltby's Cross-Appeals
 1.
 
 38
 Mr. Maltby first contests the district court's judgment in favor of Sheriff Bond. We review a judgment as a matter of law de novo and "consider the evidence in the light most favorable to the nonmoving party. We shall reverse the judgment only if enough evidence exists that might sustain a verdict for the nonmoving party." Continental Bank N.A. v. Modansky, 997 F.2d 309, 312 (7th Cir.1993). "This evidence must provide a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts." Selle v. Gibb, 741 F.2d 896, 900 (7th Cir.1984).
 
 
 39
 Although his position is difficult to discern, Mr. Maltby seems to suggest that Sheriff Bond had knowledge of the alleged constitutional violation and also had a duty to intervene to prevent Mr. Maltby's rights from being violated. However, there is no evidence that Sheriff Bond had any knowledge of the alleged constitutional violation. All of the witnesses with personal knowledge of the Dairy Queen transaction testified that they did not discuss with Sheriff Bond the initial information from Hankins, the details of the buy itself, or the subsequent proceedings. Inspector Winston testified that he apprised Sheriff Bond of the Dairy Queen transaction, but "[j]ust the basics of what we did. We bought what we believed to be a controlled substance from Kerry Maltby." Tr. 115. Inspector Winston did not inform Sheriff Bond of the particulars of the transaction, specifically the identity of the confidential informant. Id. Sergeant Kempf testified that he told Sheriff Bond that Mr. Maltby was going to be arrested. Id. at 283. However, he also testified that Sheriff Bond had no connection with the transaction that served as the basis for the criminal complaint because this was strictly a Task Force operation. Id. at 283-84. Sergeant Kempf also testified that the Task Force Review Committee, of which Sheriff Bond was a member, would receive a general overview of Task Force activities at its monthly meeting. However, the update was "[s]trictly an overview" of the operations and did not venture into the details of any of the transactions. Id. at 349. Mr. Maltby's attorney in the criminal proceedings, testified that he did not discuss Mr. Maltby's case with Sheriff Bond because "he was simply the custodian of Mr. Maltby, as a Sheriff. This was a drug and Task Force thing. And I don't think the Sheriff was actually involved." Id. at 391. Sheriff Bond testified that his only contact with Mr. Maltby was transporting him to and from his court appearances. During one of these trips, Mr. Maltby had said that "we had the wrong guy, and that he didn't know why he had been charged. Something to this order." Id. at 497. Sheriff Bond, in response, phoned the Task Force office to make sure that there had been an identification of Mr. Maltby. Id. at 498. Finally, the prosecutor stated that she never spoke with Sheriff Bond about the case. Id. at 545-46.
 
 
 40
 Mr. Maltby claims that, on the basis of Sheriff Bond's actions (inquiring whether the undercover officer had identified Mr. Maltby), a reasonable jury could infer that he knew that a positive identification had not been made, that he knew that Hankins was the informant, and consequently, that he knew that the entire case against Mr. Maltby "was based on a snitch who had disappeared." Appellee/Cross Appellant's Br. at 60. "These inferences," argues Mr. Maltby, "could have been taken into account by the jury in assessing Bond's knowledge and supported a judgment against him." Id. Mr. Maltby points to Juriss v. McGowan, 957 F.2d 345 (7th Cir.1992), in support of the proposition that the jury could draw such inferences. Mr. Maltby's reliance on Juriss is misplaced. In Juriss, several witnesses were willing to testify that the defendant had misrepresented crucial facts to the grand jury. The court determined that there was sufficient evidence to raise a jury issue as to whether the defendant had participated with another officer in violating plaintiff's civil rights. By contrast, here there is no evidence that Sheriff Bond knew anything about the Dairy Queen transaction other than that it took place and that the seller was Kerry Maltby. There are no discrepancies in testimony from which the jury could infer that Sheriff Bond knew more than the most basic of facts surrounding this transaction. Mr. Maltby produced no evidence that Sheriff Bond had any knowledge that should have apprised him of the alleged constitutional deprivations. Any verdict against Sheriff Bond, therefore, would have been based on pure speculation. The district court did not err in entering judgment as a matter of law for Sheriff Bond.
 
 
 41
 In sum, Mr. Maltby's claim against Sheriff Bond fails because there is no evidence that Sheriff Bond was personally involved in the alleged violation. We have stated that
 
 
 42
 "[t]o recover from damages under 42 U.S.C. Sec. 1983, a plaintiff must establish defendant's personal responsibility for the claimed deprivation of the constitutional right. However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent."
 
 
 43
 Rascon v. Hardiman, 803 F.2d 269, 273 (7th Cir.1986) (quoting Smith v. Rowe, 761 F.2d 360 (7th Cir.1985) (citations omitted)). There are no facts presented, however, that evidence any kind of personal involvement by Sheriff Bond in the alleged constitutional violation. Sheriff Bond did not participate in the transaction, in the arrest, the preliminary hearing, or any part of the prosecution of Mr. Maltby. Sheriff Bond was Mr. Maltby's custodian and nothing else.[13] Consequently, there is not sufficient evidence for a jury to hold Sheriff Bond liable for any of Mr. Maltby's alleged constitutional violations.
 
 2.
 
 44
 Mr. Maltby also cross-appeals the jury verdict in favor of the Task Force. Mr. Maltby suggests three grounds for reversal. First, Mr. Maltby claims that he was prejudiced when the district court failed to give his proffered instructions and gave other instructions over his objection. Second, he argues that the trial court abused its discretion in not allowing him to pursue certain matters in discovery. Finally, he maintains that the district court abused its discretion by refusing to allow his expert to testify regarding certain policies of the Task Force. We turn first to his jury instruction argument.[14]
 
 
 45
 a. propriety of jury instructions
 
 
 46
 Our review of jury instructions on appeal is limited. "We review jury instructions only to determine if 'the instructions as a whole were sufficient to inform the jury correctly of the applicable law.' " Patel v. Gayes, 984 F.2d 214, 218-19 (7th Cir.1993) (quoting United States v. Villarreal, 977 F.2d 1077, 1079 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993)). "Reversal is warranted only if the instruction misguides the jury so much that a litigant is prejudiced." Doe v. Burnham, 6 F.3d 476, 479 (7th Cir.1993). Thus, we undertake a two-part inquiry. First, we must determine whether the instruction misstates or insufficiently states the law. If the first requirement is met, we then determine whether the misstatement "confused or misled the jury causing prejudice to a litigant." Id. Mr. Maltby suggests that such prejudice occurred as a result of certain instructions given by the district court to which Mr. Maltby objected, and also as a result of the failure of the district court to give certain instructions proffered by Mr. Maltby.
 
 
 47
 The Task Force argues in response that error may not be predicated on the district court's failure to give Mr. Maltby's proffered jury instructions or on the district court's giving certain instructions over Mr. Maltby's objections because Mr. Maltby did not make a sufficient record in the district court. The Task Force correctly points out that the instruction conference in the district court was not memorialized in the record. Consequently, whatever transpired at that conference cannot satisfy the requirements of Federal Rule of Civil Procedure 51,[15] which requires a specific objection on the record.
 
 
 48
 We agree with the Task Force. It was the responsibility of counsel for Mr. Maltby to preserve for appeal any claims of error based on the jury instructions. Although arguably Mr. Maltby's submissions and objections to certain instructions are of record,[16] these actions of themselves do not satisfy the mandates of Rule 51, which requires that the objector state the ground on which he rests his objection. The proper procedure, we believe, in such circumstances, is for the party submitting the objection (or tendering the instruction) to file a statement pursuant to Federal Rule of Appellate Procedure 10.[17] This approach allows a party to preserve for appellate review proceedings in the district court for which no record was made or for which no transcript is available. Thus, upon realizing that objections to the jury instructions had not been incorporated in the record, Mr. Maltby's counsel could have supplemented the record pursuant to Rule 10 in order to preserve his specific objections for appeal. See Cameo Convalescent Ctr., Inc. v. Senn, 738 F.2d 836, 842 (7th Cir.1984), cert. denied, 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985).[18]
 
 
 49
 However, even if we were to hold that Mr. Maltby's claims of error were properly before us, we would not reverse the jury verdict in favor of the Task Force on these grounds. Mr. Maltby's claims of error, when evaluated under the applicable standard, have no merit. Mr. Maltby first submits that the district court erred when it gave a modified version of his "failure to train" instruction.[19] Mr. Maltby admits that his instruction and the given instruction are both derived from the Supreme Court's opinion in City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), and adequately reflect the law as stated in that case. Because Mr. Maltby makes no allegations that the instruction as given misstates the law, error cannot be predicated on this basis.
 
 
 50
 Mr. Maltby also claims error in the separate instruction, given at the defendants' request, on the issue of "deliberate indifference."[20] Mr. Maltby claims that the "deliberate indifference" instruction given is based on Eighth Amendment cases and involves a different standard for "deliberate indifference" from that in failure-to-train cases. Mr. Maltby argues that this court's opinion in Gibson v. City of Chicago, 910 F.2d 1510 (7th Cir.1990), distinguishes the standards in the two types of cases. Because, he continues, a legally unsound instruction was given, reversal is required. We cannot agree with Mr. Maltby's contentions. Although the instruction was not the model of clarity, we cannot say that the giving of this instruction so hampered the jury's understanding of the issues that it caused prejudice.[21]
 
 
 51
 Mr. Maltby also claims that he was prejudiced by the district court's failure to give several proffered instructions. Mr. Maltby first argues that the district court should have given his proposed instructions Nos. 53, 54, and 55 which defined "policymakers" as the Review Committee, the Task Force Director, and the Squad Leader. We believe that the instruction given adequately apprised the jury of who could be a policymaker.[22] It was clear from the evidence presented at trial that only two parties could make policy for the Task Force: the Review Committee and the Task Force Director. See Tr. 345. Consequently, we do not believe that it was reversible error for the district court not to specify these bodies in the separate instruction.[23]
 
 
 52
 Finally, Mr. Maltby alleges error in the district court's failure to give his direct policymaker instruction.[24] We do not believe that the district court's failure to give this instruction restricted the jury's understanding of the issues before it. The jury was instructed adequately by those instructions already given and therefore no harm resulted from the district court's failure to so instruct.
 
 
 53
 b. denial of discovery requests
 
 
 54
 In addition to challenging the jury instructions, Mr. Maltby also claims that the district court abused its discretion when it refused to allow Mr. Maltby to pursue certain discovery requests. Specifically, Mr. Maltby alleges that the DCI is an agent of the Task Force as a result of the Task Force Agreement. The DCI, continues Mr. Maltby, had knowledge that its identification procedures were inadequate as a result of a misidentification that spawned litigation in the case of Frye v. O'Neill, 166 Ill.App.3d 963, 117 Ill.Dec. 882, 520 N.E.2d 1233, appeal denied, 121 Ill.2d 569, 122 Ill.Dec. 436, 526 N.E.2d 829 (1988). Because the DCI was an agent of the Task Force, the knowledge it had of this misidentification is imputed to the Task Force. Consequently, states Mr. Maltby, he should have been allowed to pursue discovery on this case on an agency theory.
 
 
 55
 We believe that Mr. Maltby's argument fails at a very fundamental level: Mr. Maltby has not established that the DCI is an agent of the Task Force. Mr. Maltby states in his brief that
 
 
 56
 [w]hen the Illinois State Police signed the West Central Illinois Task Force Interagency Agreement, which stated its purpose was to create a multi-jurisdictional authority to be known as the West Central Illinois Task Force, the State Police became an agent of the Task Force as a matter of law.
 
 
 57
 Appellee/Cross Appellant's Br. at 18 (citations omitted). After carefully examining the Task Force Agreement, we cannot reach the same conclusion. The Agreement contains three sections that we find particularly instructive:
 
 
 58
 I. PARTIES. Parties to this agreement are: McDonough County Sheriff's Department, Warren County Sheriff's Department, Adams County Sheriff's Department and Monmouth Police Department.[25]
 
 
 59
 ....
 
 
 60
 V. DUTIES OF THE DEPARTMENT OF STATE POLICE, DIVISION OF CRIMINAL INVESTIGATION (DCI). DCI agrees to supply the following facilities/ equipment/ services to be utilized in support of Task Force activities.
 
 
 61
 A. Facilities to house the Task Force unit.
 
 
 62
 B. Training in pro-active enforcement techniques and covert investigative methods.
 
 
 63
 C. Specialized equipment and/or communications devices/ components.
 
 
 64
 D. Arrangements for assignment of "Inspector (non-code)" status and the issuance of credentials.
 
 
 65
 Credentials/ equipment/ components supplied by the Department of State Police, Division of Criminal Investigations (DCI) to any officer or participant must be surrendered to DCI upon termination of his/her affiliation with the Task Force or upon its disbandment.
 
 
 66
 ....
 
 
 67
 IX. OBLIGATIONS.
 
 
 68
 ....
 
 
 69
 B. The Illinois Division of Criminal Investigation shall provide covert agents, clerical personnel, office space and appropriate monies for the purchase of evidence during an investigation.
 
 
 70
 Mr. Maltby rather summarily states that this participation by the DCI in the Task Force makes the DCI an agent of the Task Force as a matter of law. The conclusion is not so obvious to us. Mr. Maltby has cited us no authority which provides that under Illinois law these activities make the DCI an agent of the Task Force. We often have stated that summary arguments unsupported by authority are waived. See United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."), cert. denied, --- U.S. ----, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). Similarly, in this case, Mr. Maltby has waived any agency argument by failing to point us to applicable law. Because Mr. Maltby has produced no authority that the DCI became an agent of the Task Force, the district court did not abuse its discretion in denying him discovery based on this theory.[26]
 
 
 71
 c. admissibility of expert testimony
 
 
 72
 Finally, Mr. Maltby argues that the district court abused its discretion when it limited his expert to testimony on general police procedures. "In general, a district court has broad discretion in determining whether evidence should be admitted or excluded. In particular, a district court has broad discretion in determining whether to exclude expert witness testimony. We therefore will reverse the district court's ruling which limited the expert's testimony only if it abused its discretion." United States v. Price, 995 F.2d 729, 731 (7th Cir.1993).
 
 
 73
 Mr. Maltby fails to apprise this court of what testimony his expert was prevented from giving. Dr. Steven Egger was allowed to testify on identification techniques and their importance, Tr. 479-80, follow-up procedures, Tr. 481, and numerous other subjects. Without further elaboration from Mr. Maltby, it is impossible for us to discern the short-comings of this testimony. If Mr. Maltby is complaining that his expert was not allowed to testify to the minutiae regarding how an undercover drug operation works, the district court did not abuse its broad discretion in refusing to allow Dr. Egger to testify on these matters. Nothing in Dr. Egger's background renders him qualified to testify on this very narrow issue. There is no doubt that Dr. Egger was an expert as to general police procedure; it was within the district court's discretion to limit his testimony to those areas.
 
 Conclusion
 
 74
 For the foregoing reasons, the jury verdict against Inspector Winston is reversed because he is qualifiedly immune from suit for his actions. However, the judgment as a matter of law for Sheriff Bond and the jury verdict for the Task Force is affirmed.
 
 
 75
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 *
 The Honorable Paul E. Plunkett, of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The transactions that Hankins previously had set up did not involve actual narcotics, but look-alike substances. In Illinois, the sale of such substances, when the sellers represent them to be narcotics, is illegal
 
 
 [2]
 Officer Winston and Sheriff Bond previously had moved for summary judgment on the ground of qualified immunity. A magistrate judge recommended denying the motions. He reasoned:
 Making a positive identification of a suspect falls within the scope of common sense in police work. Reasonably well-trained police officers know or should know the need to make sure the man they arrest is the one involved in the offense under investigation. Therefore, the Defendants' claim that their conduct did not violate clearly established rights of which a reasonable police officer would have known is rejected.
 R.135 at 10. The magistrate judge also rejected Sheriff Bond's claims of qualified immunity. He found that there were issues of fact concerning whether Sheriff Bond was a policymaker for the Task Force and therefore responsible for the misidentification on a failure to train theory. Id. at 13-14. The district court accepted the magistrate judge's recommendation and denied the motions for summary judgment. R.159.
 
 
 [3]
 After the district court granted Sheriff Bond's motion for judgment as a matter of law, the following discussion occurred between counsel for Inspector Winston and the court:
 Ms. McNaught: Your Honor, I also would make a motion for the--for judgment as a matter of law.
 Court: All right. And that's on behalf of--.
 Ms. McNaught: Marty Winston and the West Central Illinois Task Force.
 Court: Very well. And I, however, will deny those motions at this time. It seems to me that we have adequate evidence here that it becomes a question of fact for this jury. And I think that I would be overstepping my prerogatives and would be violating the standard that I am held accountable to here. So, consequently, those motions are denied. And if you would like to just file a short written motion as to each, it might be wise, to flesh out the record.
 Ms. McNaught: I do have a question about Marty Winston. We have asserted qualified immunity on his behalf, and I believe that is a question only for the Court.
 Court: That's still a viable one.
 Ms. McNaught: Okay.
 Tr. 614-15.
 
 
 [4]
 The court made rulings on proffered instructions in an instructions conference held without a court reporter present. No part of the formal record indicates which instructions were given over objections, nor if there were proffered instructions that were rejected
 
 
 [5]
 The court instructed the jury accordingly:
 One of plaintiff's claims is that he was deprived of his liberty "without due process of law." To be deprived of one's liberty without "due process of law" means to be deprived of such right without authority of the law. Before you can determine, then, whether or not the Plaintiff was deprived by the Defendant(s) of his liberty "without due process of law" you must first determine from a preponderance of the evidence in the case whether the Defendant(s) committed the acts alleged, and, if so, whether the Defendant(s) acted under circumstances within or without the bounds of their lawful authority under state law. If the Defendant(s) acted within the limits of their lawful authority under state law, then the Defendant(s) could not have deprived the Plaintiff of any right "without due process of law."
 Under the law of the State of Illinois, police officers may not apply for an arrest warrant unless they have probable cause to believe that a crime has been committed and the person in question has committed that crime. Probable cause exists if the facts and circumstances known to the officer and of which he had reasonable, trustworthy information are sufficient to warrant a prudent person in believing that the person has committed a crime.
 R.224.
 
 
 [6]
 Qualified immunity, we have stated, is not merely a defense to liability but an immunity from suit. Gorman v. Robinson, 977 F.2d 350, 354 (7th Cir.1992). Accordingly, " 'qualified immunity questions should be resolved at the earliest possible stage in litigation.' " Cygnar v. City of Chicago, 865 F.2d 827, 843 n. 16 (7th Cir.1989) (quoting Anderson v. Creighton, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987))
 
 
 [7]
 Some panels of this court have stated, without circulation to the whole court under Circuit Rule 40(f), that the standard of review for denials of qualified immunity when probable cause is at issue is clearly erroneous and not de novo. In Mahoney v. Kesery, 976 F.2d 1054 (7th Cir.1992), a panel of this court reviewed a finding of probable cause and a denial of qualified immunity on a clearly erroneous standard:
 We shift focus now from the trial court to the appellate court: Whoever makes the finding of probable cause (judge or jury), we do not review it de novo, because for purposes of appeal such a finding is a finding of fact. (We do of course review pure determinations of law, and they are frequent in immunity cases.) The standard for appellate review of findings of probable cause was unsettled when this case was briefed and argued, though there was abundant authority that the standard was clear error--at least in a civil rights case, such as this. E.g., Jones v. City of Chicago, supra, 856 F.2d at 995 [ (7th Cir.1988) ]; Hughes v. Meyer, 880 F.2d 967, 969 (7th Cir.1989); United States v. McKinney, 919 F.2d 405, 419 (7th Cir.1990) (concurring opinion). Simkunas v. Tardi, supra, 930 F.2d [1287] at 1291 [ (7th Cir.1991) ], does, it is true, say that the standard of review is de novo, but the court was speaking in the context of review of summary judgment--where the standard really is de novo. We are asked in this case to review a factual determination of probable cause, not a legal determination that there is no genuine issue of material fact, and it is now settled that the standard of review of a factual determination of probable cause is, in this circuit anyway, clear error, and this whether the determination is made by a magistrate, by a district judge or the trial judge, or by a jury. United States v. Spears, 965 F.2d 262, 269 (7th Cir.1992).
 Kesery, 976 F.2d at 1059. The reason for the deferential standard, the panel stated, is that when a Sec. 1983 action centers on the existence of probable cause, the question of immunity (whether a reasonable officer acting in the officer's position would have known that he was violating a constitutional right) merges with the merits (whether a reasonable officer in the officer's position would have believed the person had committed a crime). Maxwell v. City of Indianapolis, 998 F.2d 431, 435-36 (7th Cir.1993), also suggested that the issues of qualified immunity and the merits merge when probable cause is involved. However, we believe the premise (that the merits and the question of probable cause merge), on which the conclusion (that a clearly erroneous standard of review applies) is based, does not adequately take into account the Supreme Court authority which is binding upon this court. In both Malley and Bryant, the Supreme Court dealt with qualified immunity based on probable cause. In both cases, the Court suggested a bifurcated analysis--an inquiry into qualified immunity separate from that of probable cause. See discussion supra. We believe that, if the Court had believed that the questions of qualified immunity and probable cause merged, these cases presented appropriate opportunities to so hold. Furthermore, this court has recognized that other Supreme Court authority suggests the two-prong inquiry. See Hughes v. Meyer, 880 F.2d 967, 970 (7th Cir.1989) ("But even in the absence of probable cause for an arrest, qualified immunity provides officers with an additional layer of protection against civil liability.") (citing Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)), cert. denied, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990). Thus, we do not believe that Kesery can control our inquiry here.
 The Kesery panel noted three other cases that have applied a clearly erroneous standard: Hughes v. Meyer, 880 F.2d 967 (7th Cir.1989); Jones v. City of Chicago, 856 F.2d 985 (7th Cir.1988); and Klein v. Ryan, 847 F.2d 368 (7th Cir.1988). After a thorough review of these cases, we do not believe that they support the use of a clearly erroneous standard. In Hughes, this court stated:
 We apply the "clearly erroneous" standard of review to the district court's determination that " 'a reasonable police officer in like circumstances [c]ould have acted as the defendants did.' "
 880 F.2d at 969 (quoting Jones, 856 F.2d at 995 (quoting Klein v. Ryan, 847 F.2d 368, 374 (7th Cir.1988))). Yet, the court in Hughes also noted that qualified immunity "provides officers with an additional layer of protection against civil liability." Id. at 970. The Jones court stated the standard accordingly:
 The issue rather is whether the district judge committed a clear error in finding that no "reasonable officer in like circumstances would have acted as the defendants did[.]" Klein v. Ryan, 847 F.2d 368, 374 (7th Cir.1988).
 Jones, 856 F.2d at 995. Yet, it also distinguishes between "whether the defendants had probable cause" and whether "reasonable officers in their position could have thought they had probable cause." Id. We look, therefore, to Klein, which forms the basis for all of the other opinions. That decision, however, never addresses standard of review. Klein, it is true, states that "[w]e need only consider whether a reasonable officer in like circumstances would have acted as defendants did." Klein, 847 F.2d at 374. This court in Klein made that determination on its own--there is no suggestion in that opinion that deference was given to the district court with respect to this inquiry. Consequently, we review the district court's qualified immunity determination de novo.
 
 
 [8]
 Cf. Malley, 475 U.S. at 341, 106 S.Ct. at 1096 (noting that qualified immunity does not extend to those who "knowingly violate the law")
 
 
 [9]
 Indeed, the prosecutor testified that the information from the confidential informant played a very minor role in the decision to prosecute Mr. Maltby. The prosecutor testified:
 Mr. Lanterman: In those police reports, was there any indication that the confidential source had been accused of providing substances to the Task Force--excuse me--to people that, in turn, sell to the Task Force?
 Prosecutor: I don't recall that there was any particular information about the confidential source in those reports. I believe that was simply how the investigation was begun. But, really, the confidential source had little to do with the actual event, which the report later went on to describe.
 Tr. at 528.
 
 
 [10]
 Indeed, there is no indication from the record that the prosecutor's decision would have been different had she known this information regarding the confidential source
 
 
 [11]
 See Donovan v. City of Milwaukee, 17 F.3d 944, 951 (7th Cir.1994) ("The plaintiff bears the burden of establishing the existence of a clearly established constitutional right."); Apostol v. Landau, 957 F.2d 339, 341 (7th Cir.1992) ("The plaintiff bears the burden of convincing the court of the existence of the clearly established constitutional right at issue.")
 
 
 [12]
 Because we determine that Inspector Winston is entitled to qualified immunity, we have no occasion to reach his other claims of error. Specifically, we do not address whether probable cause actually existed, whether the court abused its discretion in admitting expert testimony over Inspector Winston's objection, whether the court erred in instructing the jury on qualified immunity, whether the jury's verdict is against the weight of the evidence, whether the damage award is excessive, or whether the court abused its discretion in awarding attorney's fees
 
 
 [13]
 Sheriff Bond's continued detention of Mr. Maltby after his claim of innocence does not constitute a constitutional violation. Cf. Baker v. McCollan, 443 U.S. 137, 145-46, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) (stating that official charged with custody of accused has no independent duty to investigate even repeated claims of innocence by the accused)
 
 
 [14]
 The Task Force, responding to Mr. Maltby's cross-appeal, for the first time claims that it is not a person for the purposes of Sec. 1983 liability and, consequently, the district court did not have jurisdiction to hear this case. We disagree with the Task Force's contention. According to 745 ILCS 10/1-202, which defines "Local public entity" for the purposes of the Local Governmental and Governmental Employees Tort Immunity Act, "Local public entity" includes "any intergovernmental agency or similar entity formed pursuant to the Constitution of the State of Illinois or the Intergovernmental Cooperation Act." This leads us to believe that the legislature of Illinois believed that the Task Force could be sued, and that it therefore provided these task forces with the same protection it afforded other local governmental bodies. Thus, although there are some aspects of the Task Force that, in the absence of statutory guidance, would counsel against a finding that it is an entity subject to suit, see Timberlake v. Benton, 786 F.Supp. 676, 682-83 (M.D.Tenn.1992) (listing factors suggesting that task force not a person for purposes of Sec. 1983), the legislature of Illinois considers the Task Force a local governmental entity in its own right. We shall not question this determination
 
 
 [15]
 Rule 51 states:
 At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. The court, at its election, may instruct the jury before or after argument, or both. No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of objection. Opportunity shall be given to make the objection out of the hearing of the jury.
 
 
 [16]
 Mr. Maltby has produced copies of these instructions in his separate appendix. On these copies are notations from the district court that the instructions were submitted and rejected or given over objection
 
 
 [17]
 Appellate Rule 10 states in pertinent part:
 (c) Statement of the Evidence or Proceedings When No Report Was Made or When the Transcript is Unavailable
 If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.
 
 
 [18]
 Cf. Niehus v. Liberio, 973 F.2d 526, 530 (7th Cir.1992) (stating that Rule 51 does not require objection and statement of reasons on the record in situation in which "uncontradicted affidavit by defendants' lawyer ... establishes that there was no violation of Rule 51")
 We note, however, that it is the responsibility of the district court, if it conducts the instruction conference without a court reporter, to provide the parties with an opportunity to specifically object to jury instructions on the record. See United States v. Murphy, 768 F.2d 1518, 1536 (7th Cir.1985), cert. denied, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). Although Murphy spoke specifically to the context of a criminal trial, we believe similar policy concerns advise application of the rule in the civil setting. We have located no place in the record that the district court specifically asked the parties if they had objections to the jury instructions. There is some indication that the district court stated that it would allow written submissions. R.231 at 8. Because Mr. Maltby does not complain that he was not provided an opportunity to object to the instructions, there is no bar to waiver in this case.
 
 
 [19]
 Mr. Maltby proposed, and the court gave, the following instruction on "failure to train":
 Plaintiff claims that he was injured as a result of the Task Force's failure to properly train its officers and this alleged failure can be considered to be the official policy of the Task Force.
 Your verdict will be for plaintiff only if you find:
 First: That the Task Force's training program was inadequate to train its officers and employees to carry out their duties, and
 Second: The need for more training or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the Task Force can reasonably be said to have been deliberately indifferent to the need for such training; and
 Third: The failure to provide proper training was a cause of injury to the plaintiff.
 R.224. Over Mr. Maltby's objection, the following explanatory instruction followed the "failure to train" instruction above:
 The inadequacy of police training of the employees of the West Central Illinois Task Force may serve as the basis for liability for a civil rights violation only when the failure to train amounts to deliberate indifference to the rights of persons with whom these police came into contact. To constitute deliberate indifference toward the plaintiff, the members of the board of directors of the West Central Illinois Task Force must have known of an actual high risk of arresting a suspect on less than probable cause and the board of directors must have consciously considered and rejected a course of conduct that knowingly would have reduced the risk of arresting a suspect on less than probable cause.
 That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability upon the West Central Illinois Task Force, because the shortcomings of the officer may have resulted from factors other than a faulty training program. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Adequately trained officers occasionally make mistakes. The fact that they do says little about the training program or the legal basis for holding the West Central Illinois Task Force liable.
 R.224.
 
 
 [20]
 The instruction as given reads:
 When I use the term deliberate indifference, I mean that each defendant had actual knowledge of a serious and imminent threat to plaintiff's constitutional rights and consciously, knowingly or recklessly refused to do anything to protect the constitutional rights of plaintiff. Failure to understand the nature of the threat, or inadvertent failure to take action, or disbelief in the existence of the threat, does not constitute deliberate indifference. Negligence, or even gross negligence, on the part of a defendant will not establish a constitutional violation. The defendant's actions must have been deliberate or reckless in a criminal sense. Recklessness, in the pertinent sense, implies an act so dangerous that defendant's knowledge of the risk can be inferred and reflects an extreme or complete indifference to the value of human liberty.
 R.224.
 
 
 [21]
 Indeed, in Gibson, cited by Mr. Maltby, we stated:
 It is well established that the requirements for municipal liability based on policies of "inadequacy" are rigorous. As noted in City of Canton, municipalities may be held for "inadequate" policies "only where the failure ... amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. [489 U.S. at 388, 109 S.Ct.] at 1204; cf. Duckworth v. Franzen, 780 F.2d 645, 653-55 (7th Cir.1985) (for purposes of the eighth amendment's prohibition on cruel and unusual punishment, the "deliberate indifference" standard of culpability means either "deliberateness," or "recklessness" in the criminal law sense--both terms imply the defendants' knowledge of the risk of deprivation), cert. denied, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).
 Gibson, 910 F.2d at 1522. Thus, this court did not find the standards so different that we could not use the Eighth Amendment articulation as an apt comparison to the failure to train articulation.
 
 
 [22]
 The instruction as given states:
 "Official Policy or custom" may be established based on a single decision by a government policy maker if the single act:
 (1) Is a decision of the governing body, or
 (2) Is executed in compliance with formal rules or understandings that are intended to, and do, establish fixed plans of action to be followed under similar circumstances, consistently and over time, or
 (3) Is directed by those who establish governmental policy.
 R.224.
 
 
 [23]
 With respect to Plaintiff's Instruction No. 55, which specified a Squad Leader as a policymaker, we uphold the district court's determination on a different ground. We do not believe that there was any evidence submitted at trial that spoke to the issue whether a Squad Leader could make Task Force policy. Thus, it certainly was not error for the court to so instruct the jury
 
 
 [24]
 This instruction reads:
 Plaintiff claims that the West Central Illinois Task Force, is liable to him for the constitutional deprivations that he alleges. You are instructed that the Task Force may be liable where you find that Plaintiff has been deprived of his constitutional rights and such deprivation was done pursuant to the Task Force's custom, policy, or decision. When the Plaintiff is injured as a result of Task Force's policy, custom, or decision, whether made by its policymakers or by those officials whose edicts or acts may fairly be said to represent official policy, the Task Force itself may be responsible for the injury that it caused.
 
 
 [25]
 An addendum to the agreement was later added that included the Adams, Schuyler, and Pike County Sheriff's Departments and the Quincy Police Department as parties
 
 
 [26]
 Mr. Maltby cites numerous cases on agency law generally that explain the operation of the agency relationship. These, however, are wholly irrelevant to the analysis until the agency relationship is established
 Mr. Maltby also argues that the doctrine of collective knowledge applies; as a result, the Task Force is imputed with all knowledge of the DCI. Mr. Maltby miscomprehends the doctrine. The collective knowledge doctrine is designed to allow law enforcement personnel from the same agency, or from different jurisdictions, to rely on the probable cause determinations of one another in order to apprehend specific suspects. See generally United States v. Celio, 945 F.2d 180 (7th Cir.1991). "The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superior or associates." United States v. Valez, 796 F.2d 24, 28 (2d Cir.1986) (citing United States v. Canieso, 470 F.2d 1224, 1230 n. 7 (2d Cir.1972)), cert. denied, 479 U.S. 1067, 107 S.Ct. 957, 93 L.Ed.2d 1005 (1987). The rule has never been used to impute general knowledge of identification or other general police procedures from one agency to the other in order to impute liability.