Frank **HUMPHREY**, Plaintiff,

v.

M. **DEMITRO**, et al., Defendants.

No. 94 C 6234.

United States District Court,
N.D. Illinois,
Eastern Division.

June 5, 1996.

John M. Beal, Chicago, IL, for plaintiff.

## 574

Taryn Springs, City of Chicago Law Department, for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Frank Humphrey ("Humphrey") has filed suit under 42 U.S.C. § 1983 ("Section 1983") against four City of Chicago police officers, alleging that his constitutional rights were violated when he was arrested on September 12, 1992. Humphrey asserts that officers Michael Demitro ("Demitro"), Norbert Staszak ("Staszak"), Lawrence Pajowski ("Pajowski") and Gerald Neuffer ("Neuffer") falsely arrested him, violated his right to equal protection under the law and engaged in a conspiracy to deprive him of his constitutional rights.

Defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have substantially complied with this District Court's General Rule ("GR") 12(M) and 12(N),[1] and the motion is fully briefed and ripe for decision. For the reasons set forth in this memorandum opinion and order, defendants' motion is granted in part and denied in part.

### Summary Judgment Principles

Under familiar Rule 56 principles defendants have the burden of establishing both the lack of a genuine issue of material fact and that they are entitled to a judgment as a matter of law (*Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate only if the record reveals that no reasonable jury could conclude that defendants violated Humphrey's constitutional rights. This Court is called upon to draw

inferences in the light most favorable to non-movant Humphrey, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

■ As already hinted in n. 1, defendants have done themselves a considerable disservice by their inattention to the express warning in GR 12(M)(3):

> All material facts set forth in the statement filed pursuant to section N(3)(b) will be deemed admitted unless controverted by the statement of the moving party.

Throughout their GR 12(M)(3) response defendants have asserted that they "deny the additional facts set forth by plaintiff in this paragraph" or that they "disagree with the facts set forth in paragraph—," in each instance without pointing to evidence in the record as grounds for their denial or disagreement. To that extent Humphrey's additional facts are left uncontroverted and will therefore be deemed admitted for purposes of this motion, a measure repeatedly approved by our Court of Appeals (e.g., *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389 (7th Cir.1995) and cases cited there).

Both the earlier-described basic summary judgment principles and the just-stated doctrine are especially important in this case, in which the record consists only of deposition testimony about the facts surrounding Humphrey's arrest, and in which the stories told in those depositions are at sharp odds. Defense counsel have repeatedly asserted that if all Humphrey can point to is his own version of the facts surrounding his arrest, defendants are then entitled to summary judgment.[2] That of course is dead wrong.

---

1. To facilitate the identification of any factual disputes, or to demonstrate the absence of any factual disputes, this District Court has adopted its GR 12(M) and 12(N), which require the parties to set out their respective factual positions together with references to the record. Just a bit later this opinion will explain the need for, and the significance of, the use of the adverb "substantially" to qualify the verb form "have complied" in the text.

2. For example, D.R. Mem. 3 says:

> Plaintiff's disagreement with the defendants' facts and statement of additional facts are [sic] not outcome determinative; plaintiff incorrectly views his version of the facts resulting in his arrest on September 12, 1992 as being enough to defeat defendants' motion.

Similarly, *id.* 4 states (emphasis deleted):

> Although plaintiff concedes ... that there are statements made by defendants in their depositions that support the proposition that plaintiff was obstructing them in the performance of their duties, he believes that because he pres-

Defendants seem to believe that Humphrey's rendition of the facts—his sworn version of what happened—means nothing. But what is defendants' own deposition testimony other than *their* sworn rendition of the facts?

When two sworn factual versions thus conflict, there is a genuine issue of fact. Humphrey's version of the facts must be credited at this stage, for it will be up to the factfinder later—and not to this Court now—to decide whether to believe Humphrey or the police officers. As *Door Sys., Inc. v. Pro–Line Door Sys., Inc.,* 83 F.3d 169, 172 (7th Cir.1996) (citations omitted) has recently reconfirmed:

> Summary judgment is not to be used to resolve evidentiary conflicts, but merely to identify their presence or absence. Before it can properly be granted, therefore, the court must have a very high degree of confidence that any disagreement over the facts is spurious. The heavy caseloads that press on federal district courts today, especially in the large metropolitan districts such as the Northern District of Illinois, from which this case comes to us, make it tempting to use summary judgment as an abbreviated form of trial. We have warned against yielding to that temptation.

What follows in the *Facts* section, then, is a factual statement drawn from the parties' submissions, with any differences between them resolved in Humphrey's favor.[3]

### Facts [4]

On Saturday, September 12, 1992 all four officers were assigned to the Chicago Police Department's Mass Transit Unit (D. 12(M) ¶ 1), and all were working in plain clothes (not in uniform) (*id.* ¶ 5). Humphrey was in Chicago for the weekend (he then lived in Madison, Wisconsin) to attend the wedding of a childhood friend. Humphrey is black and all four police officers are white.

Humphrey drove to downtown Chicago on the morning of September 12, 1992 to pick up a tuxedo to wear at the wedding (Humphrey Dep. 55). He parked his car on Randolph Street just west of State Street (D. 12(M) ¶ 3). Meanwhile Demitro, Staszak and Neuffer were standing on the west side of State Street when they saw Pajowski chase a black man, Willie Kelly ("Kelly"),[5] out of the stairwell that leads from the subway to the street near the corner of State and Randolph (*id.* ¶ 2). All three officers took up the chase as Kelly headed west on Randolph Street, but Demitro and Neuffer caught Kelly about halfway down the block and arrested him (*id.* ¶ 3). Staszak trailed about 30 yards behind Demitro and Neuffer when they caught Kelly (Neuffer Dep. 12).

Humphrey saw Kelly being arrested as he left his car. He testified (Humphrey Dep. 60–61)

> I heard vulgar language, and I saw what appeared to be handcuffs go around this individual's hands. I heard language, and I saw the hair of this individual get pulled and—and language uttered to the effect that, Didn't I tell you not to ever try to run away from me, or something to that effect, the m-f word and other language.
>
> And there was a retaining wall at that point in time—it looked like a retaining

---

ents a "different rendition" of the facts that somehow means that the facts are controverted.

**3.** Because nonmovant Humphrey's version of the facts must now be taken as true, this opinion will not use hedging phrases such as "Humphrey contends" or "Humphrey asserts" when setting out the factual background. Moreover, this opinion will not always identify the frequent disagreements between the parties' versions of the facts.

**4.** This opinion will use "D." for defendants and "H." for Humphrey in referring to their respective statements under GR 12(M) ("D. 12(M) ¶ —") and 12(N) ("H. 12(N) ¶ —") and to their exhibits and memoranda. Where Humphrey has

explicitly or implicitly admitted a portion of defendants' GR 12(M) statement, only "D. 12(M) ¶ —" will be cited. Whenever possible this opinion will cite only to the GR 12(M) and 12(N) statements, not to the underlying record references.

**5.** All four defendants knew Kelly, who apparently had some psychological problems and who had previously had a number of encounters with the officers (D. 12(M) ¶ 2). According to Pajowski, Kelly had been arrested by the officers in the past for "[t]urnstile jumping, panhandling, and just being an all around nuisance" (Pajowski Dep. 11).

wall; I don't know. Maybe there was construction going on there—and it appeared as if, while they were pulling his hair and shaking his head, that they were going to thrust it forward.

One of the officers at that time looked over and saw me observing this and seemingly gave indication to the other officers to curtail their behavior.

Because they were in plain clothes, Humphrey did not know at the time that Demitro, Neuffer and Staszak were police officers (*id.* 64, 77).

As Demitro and Neuffer escorted Kelly east on Randolph back toward the subway entrance, Humphrey approached Staszak and asked him if he was a police officer and, if so, for his name and badge number (H. 12(N) ¶ 3). Staszak replied, "Go get fucked." Humphrey continued to press Staszak for information as Staszak walked east on Randolph toward State, and Staszak became "more belligerent and abusive" (*id.*). In response to further requests for his name and badge number, Staszak replied that it was "none of his damn business" and told Humphrey to "get the hell out of here" (*id.* ¶ 4).

When Staszak and Humphrey reached the subway entrance, Demitro and Neuffer had already gone underground with Kelly to place him in a holding area[6] (Humphrey Dep. 86). At that point Staszak arrested Humphrey (*id.* 86–87):

> [Staszak] wouldn't give me any more information. I said, I'm just asking. And as I recall him saying, You want to know who I am? You want to find out what I do? You can find it out at the police station.
>
> That's the first time he said police.
>
> And I said, What do you mean? He said, Well, you're going to be under arrest. And as I recall, he was very vague and

really didn't say very much outside of some interfering.

Staszak then handcuffed Humphrey (*id.* 93). At about the same time Demitro and Neuffer returned to the street from the subway, and Demitro asked Staszak what Humphrey was doing there (*id.* 100–01). Humphrey could not hear Staszak's response, but Demitro then said to Humphrey, "You want to be a good Samaritan. This is not any of your business" (*id.* 102).[7]

Staszak, Demitro and Neuffer then took Humphrey down into the subway, where the police had an area for doing paperwork and holding arrestees. Pajowski, who had earlier returned to the subway to try to find out what Kelly had done before he began to flee Pajowski at the start of the incident, learned that Humphrey had been arrested only when he returned to the holding area (D. 12(M) ¶ 17). Pajowski remained present while Humphrey was detained, both in the subway and later at the First District police station at 11th and State Streets.

Meanwhile Neuffer called for a vehicle to transport everyone—the officers, Humphrey and Kelly—to the First District station. Humphrey remained handcuffed for a short time until the vehicle arrived (H. 12(N)(3)(b) ¶ 3). At one point Humphrey told Staszak that "this hurts," referring to the handcuffs (H. 12(N) ¶ 20). It is uncontroverted that Humphrey experienced numbness and cramping in his wrists for a couple of days because of the handcuffing, but he did not have any lasting impairment as result of the incident (D. 12(M) ¶ 21).

Humphrey's handcuffs were removed shortly after he arrived at the police station (Humphrey Dep. 165). He remained at the station for several hours while the officers processed him and decided what charges to

---

**6.** That was actually a ticket booth that was not in use.

**7.** Defendants' story (summarized at D. 12(M) ¶¶ 4–13)—which is discredited for present purposes—diverges radically from Humphrey's. As defendants would have it, Humphrey did not confront Staszak at all, but instead approached Demitro as he escorted Kelly down the street; Humphrey continued to obstruct Demitro as he attempted to escort Kelly; Humphrey repeatedly

"loudly" asked "What are you doing . . . this isn't L.A. and this isn't another Rodney King incident"; Demitro warned Humphrey three or four times that he was interfering with them and that if he did not leave he would be arrested; Humphrey blocked defendants from entering into the subway; it was Demitro and not Staszak who arrested Humphrey; Staszak only assisted Demitro in handcuffing Humphrey; and defendants had not yet taken Kelly down into the subway when Humphrey was arrested.

file. It is unclear even among defendants as to who talked with whom on that subject. Demitro claims that all four officers had a conversation with a "Sergeant Rose"—the watch commander—about the charge (Demitro Dep. 46–47). Initially Staszak said that he participated in a conversation with the other officers about what charge to bring,[8] but he later said that he discussed the charge only with Demitro (Staszak Dep. 31). Neuffer admits only to being "in the vicinity" when charges were discussed (Neuffer Dep. 29).

Ultimately Sergeant Rose made the decision to charge Humphrey with disorderly conduct but not with obstructing a police officer (Demitro Dep. 47). According to Neuffer, he heard Sergeant Rose explain that "since there was no violent confrontation, no physical confrontation, [he] didn't want to use that [interfering with police] charge" (Neuffer Dep. 29). Demitro signed the criminal complaint (D. Ans. ¶ 26). After being held for several hours, Humphrey was released on a personal recognizance bond.

At Humphrey's first scheduled court appearance on November 2, 1992, both Demitro and Staszak showed up and spoke with the state's attorney assigned to the case, who added an "obstructing a police officer" charge (Staszak Dep. 35–37; Demitro Dep. 51–53). However, for reasons that are unclear from the record, at Humphrey's second court appearance the charges were dropped "with leave to reinstate"[9] (Staszak Dep. 39; Complaint ¶ 29). To date the charges have not been reinstated.

On September 9, 1994 Humphrey filed this action in the Circuit Court of Cook County, and the following month defendants timely removed the case to this District Court. On defendants' motion this Court orally dismissed the Complaint's state law claims because they were barred by Illinois' one-year statute of limitations for civil suits against employees of local governments (745 ILCS 10/8–101). Humphrey then filed an Amended Complaint ("AC"), contracting his claims to these four counts:

I. Malicious Prosecution

II. Federal Civil Rights Violation— Search and Seizure

III. Federal Civil Rights Violation— Equal Protection

IV. Conspiracy

On November 22, 1995 this Court granted defendants' motion to dismiss Count I. That left the last three counts, which are now the subject of the current motion.

■ Before it turns to the substance of the motion, this opinion must reject a procedural argument made by defendants throughout their submissions—that summary judgment is appropriate because Humphrey did not include in the AC some of the legal theories that he now advances in attempting to stave off summary judgment.[10] Again defendants have missed entirely the necessary corollary of a fundamental principle of federal practice.

In the federal courts we operate under a notice pleading regime: Rule 8(a)(2) specifies that the pleader's minimal duty is to set out a "short and plain statement of the claim showing that the pleader is entitled to relief." *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir.1992) (citation omitted) makes clear that what Humphrey has done comports with Rule 8(a)(2):

---

**8.** Here was Staszak's first version, given in response to the question "Did you participate in a conversation with other officers about what charges should be filed against Mr. Humphrey while you were at the First District station?" (Staszak Dep. 31):

Yes. We knew what we were going to charge Mr. Humphrey with. We wanted to charge him with interfering and disorderly conduct.

**9.** According to both Staszak and Demitro, they came to court for Humphrey's second appearance, which was scheduled for an 11 a.m. court call. When they arrived they were informed that it had been called during the 9:30 a.m. call, and

the charges had then been dismissed (Staszak Dep. 37–39; Demitro Dep. 53–58).

**10.** For example, D.R. Mem. 6–7 argues that Humphrey should not be able to use the theory set out in *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972) to include Neuffer in the false arrest claim. Defendants also insist (D.R.Mem. 11) that because Humphrey did not specify whether he was bringing a conspiracy claim under Section 1983 or under 42 U.S.C. § 1985(3) (or both) that he should be precluded from advance a conspiracy theory altogether.

Identifying legal theories may assist defendants and the court in seeing how the plaintiff hopes to prevail, but this organization does not track the idea of "claim for relief" in the federal rules. Putting each legal theory in a separate count is a throwback to code pleading, perhaps all the way back to the forms of action; in both, legal theory and facts together created a "cause of action." The Rules of Civil Procedure divorced factual from legal aspects of the claim and replaced "cause of action" with "claim for relief" to signify the difference. A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests, and different theories therefore do not multiply the number of claims for relief.

Indeed, it does not impair the viability of a complaint if plaintiff's counsel does choose to include allegations setting out theories of relief but gets them wrong (*Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992)). Thus Humphrey was well within his rights to have waited until the filing of his memorandum in response to defendants' Rule 56 motion before his counsel set out all of the legal theories on which he wishes to proceed in this action.

### False Arrest [11]

Humphrey's first theory is that he was the victim of a false arrest in violation of the Fourth Amendment's prohibition of unreasonable seizures.[12] Humphrey asserts that Staszak (who he says arrested him) and Demitro (who signed the criminal complaint)

are directly responsible for his arrest, and that Neuffer should be held liable under the theory set out in *Byrd*, 466 F.2d at 11 because he failed to intervene when he knew that Humphrey was being unjustifiably arrested. Humphrey admits that "insufficient facts have been developed through discovery to attribute enough knowledge" to Pajowski to hold him liable for false arrest (H. Mem. 4).

▮ To prevail at trial on his constitutional false arrest claim, Humphrey must show that he was arrested without probable cause.[13] Conversely, the existence of probable cause is an absolute bar to recovery for false arrest. *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir.1994) is one of many cases that provides insight into the "probable cause" concept:

> Probable cause exists if under the totality of circumstances it was reasonable for the officer to believe that a particular individual had committed a crime.

Whether probable cause exists is a "practical, common sense determination" based on all the circumstances known to the officer (*United States v. Valencia*, 913 F.2d 378, 382 (7th Cir.1990)). Even malicious motives for an arrest will not support a false arrest theory if probable cause existed (*Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir.1993)).

▮ In addition to claiming that they had probable cause to believe that Humphrey was engaging in disorderly conduct [14] or re-

---

**11.** Originally defendants apparently believed that Humphrey was also pursuing an excessive force claim based on an allegation that his handcuffs were too tight (see D. Mem. 6–9). Humphrey put matters right at H. Mem. 2:

> Plaintiff is asking to be compensated for that pain [from the handcuffing] as an element of damages, but is not asserting a separate excessive force cause of action.

Consequently this opinion need not address the non-issue of excessive force.

**12.** This opinion will adhere to the conventional and convenient (although technically imprecise) practice of referring to the Fourth Amendment (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors but has been construed to embody Bill of Rights guaranties). It will also employ the equally con-

venient (though equally imprecise) terminology of "false arrest" (a state law claim) rather than the more accurate concept of "seizure" within Fourth Amendment jurisprudence, but the constitutional standards will of course be applied.

**13.** Of course all Humphrey needs to do at this Rule 56 stage is to present a disputed issue of material fact—he need not "show" or "prove" anything.

**14.** 720 ILCS 5/26–1(a)(1) provides:

> (a) A person commits disorderly conduct when he knowingly:
> (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace....

Disorderly conduct of that type is a Class C misdemeanor (720 ILCS 5/26–1(b)).

sisting or obstructing a police officer [15] or both, defendants also assert that they are entitled to qualified immunity even if the officers were mistaken and probable cause did not actually exist. On that score *Maltby v. Winston*, 36 F.3d 548, 555 (7th Cir.1994), quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988), has held that qualified immunity in the false arrest context kicks in at a lower level than the probable cause required to defeat a constitutional false arrest claim: [16]

> [W]e have recognized that *"Malley [v. Briggs*, 475 U.S. 335, 337, 106 S.Ct. 1092, 1094, 89 L.Ed.2d 271 (1986) ] created room for an immunity defense even in cases where there was no probable cause for arrest, by holding that 'if officers of reasonable competence could disagree' on whether there was probable cause, the defendant would be immune from damages liability. In other words, only if no reasonable officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited."

Thus the inquiry in the false arrest context when a qualified immunity defense is raised is twofold: (1) whether the officers actually had probable cause (if yes, that blows a fatal hole in plaintiff's prima facie case) or (2) whether a reasonable officer could have mistakenly believed that probable cause existed even if it did not (thus giving rise to qualified immunity under *Maltby* ).

**15.** 720 ILCS 5/31–1 provides:
> A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer of any authorized act within his official capacity commits a Class A misdemeanor.

**16.** This Court has in the past (pre-*Maltby* ) wondered whether "subtle distinctions (if any at all) may exist between probable cause as grounds for immunity and probable cause as a substantive defense" (*Yattoni v. Oakbrook Terrace*, 801 F.Supp. 140, 146 (N.D.Ill.1992)). Why? As *Yattoni, id.* (citations omitted) said:
> Because a "reasonable ground for belief of guilt" supplies probable cause, every arrest on probable cause is reasonable by definition. Only an "unreasonable" arrest can violate the Fourth Amendment, by the plain language of that provision. Hence a person arrested on probable cause cannot make out a prima facie case under Section 1983.

Defendants do not note this distinction, but they nonetheless broadly assert that probable cause existed because Humphrey "interfer[ed] in the defendants [sic] arrest of Willie Kelly and became loud and disruptive after he was repeatedly told by the officers to cease his behavior" (D.Mem. 5). Their position is that Humphrey repeatedly directed his questions and verbal attacks at Demitro while the latter was escorting Kelly, thus justifying an obstruction charge (e.g. D. 12(M) ¶¶ 4, 6–12). And their view would appear to be that Humphrey's "loud and disruptive" behavior gave them probable cause for a disorderly conduct arrest.

But Humphrey's story, which must be credited for purposes of this motion, is radically different from the one told by the defendants. And it must be understood that the need to *credit* Humphrey's version of events also means the need to *discredit* defendants' versions. By definition, then, factfinders confronted with what they considered Humphrey's believable account of events and a pack of lies from the police officers could more than rationally find that the officers were totally lacking in probable cause to have arrested Humphrey. And in *Maltby* terms, on that scenario *no* reasonable police officer could have believed the arrest warranted. That is the perspective from which the following recapitulation of Humphrey's account—accepted as factually accurate—must be viewed:

> On the obverse side of the same coin, it would seem logical that if an officer has acted unreasonably in making an arrest (that is, lacked probable cause to do so), the result is a constitutional violation for which no qualified immunity is available (after all, the legal rule has long been clearly established, and as *Boyce v. Fernandes*, 77 F.3d 946, 948 (7th Cir.1996) says, "the concept of probable cause has not changed in a great many years"). Indeed, *Boyce, id.* characterized the "suggest[ion]" in *Maltby* as "in great tension with" other Seventh Circuit decisions and as "a surprising suggestion." But because *Boyce* had no occasion to resolve that perceived tension, this Court will continue to treat *Maltby* as the controlling pronouncement for this case. As it turns out, *Boyce, id.* was also accurate in predicting that "no case may ever turn on its untangling"—it surely makes no difference to the result here.

It must be believed on the present motion that Humphrey approached only Staszak (H. 12(N) ¶ 6), who was admittedly trailing behind as Neuffer and Demitro escorted Kelly (Staszak Dep. 16). All that Humphrey then did was to ask repeatedly for Staszak's name and badge number, and it was in response to his questions that Staszak became increasingly loud, belligerent and abusive (Humphrey Dep. 79–87). Initially Demitro and Neuffer did not even know what was going on because they were not present when Staszak told Humphrey he was under arrest—at that time Demitro and Neuffer had taken Kelly down into the subway (*id.* 86). It was only when Staszak had already decided to arrest Humphrey and had begun to handcuff him that Demitro and Neuffer returned from below and Staszak filled them in as to what was going on (*id.* 100–03).

Thus according to Humphrey he was arrested merely because Staszak perceived that Humphrey was trying to get him and the other officers in trouble for having used excessive force in Kelly's arrest.[17] That precludes the entry of judgment in defendants' favor at this point—it will be up to a jury to determine whether Humphrey or the officers are to be believed. Hence neither a finding of qualified immunity nor a finding of probable cause is warranted, given the facts still at issue.

Neuffer poses a somewhat different question. He insists that he cannot be liable for false arrest at any rate because he was not even present when Humphrey was arrested.[18] Humphrey counters that a police officer has a duty not to ignore constitutional violations committed by other officers (*Byrd*, 466 F.2d at 11), so that Neuffer can be held liable under Section 1983(1) if he knew that Humphrey was being unjustifiably arrested and (2) if he had a realistic opportunity to intervene and prevent the false arrest from occurring (*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994)).

■ Humphrey's sworn version of the facts could support a reasonable jury's conclusion that Neuffer was liable under a *Byrd* theory. According to Humphrey, Neuffer was present as Staszak was in the process of arresting Humphrey (Humphrey Dep. 87, 101–03), and he was also present when Staszak explained to Demitro why Humphrey was being arrested (*id.* 101–02). That latter conversation gave rise to Demitro's comment that Humphrey should not be a "good Samaritan" and that Kelly's arrest was "none of [Humphrey's] business," which supports Humphrey's story that the arrest was made not because Humphrey was actually being disorderly or obstructing the officers but rather because Humphrey was asking questions that Staszak (and the other officers) did not want to answer. Certainly a reasonable jury could find that conversation put Neuffer on notice that Humphrey's arrest was not justified. Moreover, Neuffer participated in Humphrey's detention and booking, wrote up the case report (Neuffer Dep. 28–29) and was "in the vicinity" when the charges to be filed against Humphrey were discussed (*id.* 29). Obviously Neuffer had a wide window of opportunity to intervene but did not. Thus summary judgment is also not appropriate for Neuffer on the false arrest claim.

To summarize, defendants' motion is denied on the false arrest claim against Staszak, Demitro and Neuffer. Summary judgment is granted on the false arrest claim against Pajowski, for Humphrey has admit-

---

17. D.R. Mem. 4 contends that Humphrey has admitted that defendants' deposition testimony 'supports an obstruction charge. But that assertion takes a passage of Humphrey's brief wholly out of context. Here is the *entire* pertinent portion of Humphrey's brief (H. Mem. 3):

> There are certainly some statements made by the defendants in their depositions that support the proposition that plaintiff was obstructing them in the performance of their duties and was also disturbing the peace. However, plaintiff presents a very different rendition of the events of the case in his deposition. Con-

sequently, the facts on this issue are very much controverted and therefore do not support summary judgment.

Clearly that is not an admission, but rather a way of illustrating that there are major factual disputes as to the events surrounding Humphrey's arrest.

18. Neither Staszak, who Humphrey says was the officer who arrested him, nor Demitro, who signed the criminal complaint, argues that he was not sufficiently involved in Humphrey's arrest to be liable for false arrest.

ted that there is no evidence to support that claim.

### Equal Protection

■ Next Humphrey urges that defendants violated the Equal Protection Clause in arresting him because of his race. To prevail on such a Section 1983 claim, Humphrey must show that the officers "purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group" (*Sherwin Manor Nursing Ctr., Inc. v. McAuliffe,* 37 F.3d 1216, 1220 (7th Cir.1994)). For that purpose Humphrey contends that there are nuggets of evidence in the record that in the aggregate would support a finding that defendants were motivated by racial animus, enabling his equal protection claim to survive summary judgment.

■ It is true that this Court must look at the evidence as a whole and not just at the individual incidents standing alone to determine whether an inference of racial animus can be drawn (*Triad Assocs. v. Robinson,* 10 F.3d 492, 498 (7th Cir.1993)). But even when all reasonable inferences are drawn in Humphrey's favor, there is not enough evidence to infer that the officers (save one) were motivated by racial animus in arresting Humphrey.[19]

Humphrey begins by pointing out that he is a black man who tried to come to the aid of another black man who was being subjected to excessive force by white officers. He also points to several comments made by the officers (P. 12(N)(3)(b) ¶ 2):

(A) "We don't have to beat you.... We've got other ways."

(B) "You people don't know what you want."

(C) "Is this guy (Willie Kelly) worth it?"

(D) "Your cellmate is Willie Kelly."

(E) "I bet your boss would just love to hear about his ideal employee being here, won't he? I think I'll give him a call and let him know what kind of stellar employee he has?"

■ Of those statements, only (B) ("You people don't know what you want") could bear the weight of a race-based or color-based inference (or both). Under either side's version of events the police were confronted with a *single* bystander individual's effort to involve himself in the arrest of a stranger. Yet that purely individual action was met by the remonstrance of one officer (Humphrey Dep. 118 ascribed that comment to Demitro) complaining of "[y]ou people." No suggestion has been offered by defendants as to what that collectivization of just one man's activity (which from the policemen's point of view constituted interference with something that was none of his business) could denote—other than the obvious prospect that the "interference" was by one black man in the arrest of another black man ("You people ..."). As to officer Demitro, then, it must be left to a rational factfinder to determine whether that statement combined with his conduct evidences a racial or color-based animus.[20]

■ But that possible (or even likely) collectivization of blacks by one white officer does not at all justify collectivizing the defendant officers just because all of them are white. Even with a jury question as to Demitro's intent, and with all reasonable inferences from the other evidence drawn in Humphrey's favor, the facts do not support a claim of intentional discrimination based on race as to the other defendants. Although Humphrey says he perceived statements (C) and (D) to be based on race because Kelly is black, such a reading is far-fetched. Statement (E) really has nothing to do with race, either in or out of context. Statement (A), according to Humphrey, is based on race because the incident now at issue occurred roughly at the same time as the Rodney King incident in Los Angeles, but again any race-based inference is too attenuated to be plausible. Finally, the fact that Humphrey and Kelly *are* black while the officers are white

---

**19.** Once again plaintiff admits that there is insufficient evidence to proceed against Pajowski (H. Mem. 6–7).

**20.** This holding is not vitiated by Humphrey's answer during his deposition that he was "not quite certain what he [the officer] meant by 'you people' " (Humphrey Dep. 118).

adds nothing to the analysis without plausible proof that Humphrey was targeted by the officers other than Demitro *because* he was black.

Humphrey's claim that his arrest was motivated by racial animus has to be looked at in light of his basic theory of why he was arrested. That contention, supportable by his own testimony, is that the officers arrested him because he caught them roughing up Kelly, and that they became annoyed with his "good Samaritan" attempts to get their names and badge numbers to report what he had witnessed. But except as to officer Demitro, Humphrey has not really identified anything to show that he was treated the way he was because he was black—that is, he has pointed to nothing to indicate that a person of any other race would have been treated any differently by the other officers. Defendants' motion for summary judgment on the equal protection claims must therefore be granted except as to officer Demitro.

### Conspiracy

That leaves only Humphrey's conspiracy claims to be dealt with. Humphrey asserts that defendants violated 42 U.S.C. § 1985(3) ("Section 1985(3)") as well as Section 1983 when they (Complaint ¶ 44):

> conspired, confederated and agreed among themselves, and took overt actions in furtherance of such conspiracy, for the purpose of causing plaintiff to be unlawfully arrested and prosecuted.

To succeed on any Section 1985(3) claim, Humphrey must prove (*Bowman v. City of Franklin*, 980 F.2d 1104, 1109 (7th Cir.1992)):

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) teach-

es that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" must be involved to satisfy the second of those elements. But what has been said in the just-concluded section of this opinion negates the presence of that factor as a group motivation. Consequently Humphrey's Section 1985(3) claim also does not survive defendants' motion.

In terms of Humphrey's Section 1983 conspiracy claim, however, he must simply prove (*Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir.1979) (per curiam)) "a combination of two or more persons acting in concert to commit an unlawful act" where those persons agree to inflict an injury upon another and where there is "an overt act that results in damage." *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991) provides additional detail:

> First, a conspiracy requires an agreement. Second, the agreement need not be overt, but if not, the alleged acts must be sufficient to raise the inference of mutual understanding. Third, acts performed together by the members of a conspiracy are adequate when they are unlikely to have been undertaken without an agreement.

Although Humphrey cannot point to an overt agreement, he claims (H. Mem. 7) that "the joint action of the four officers to arrest plaintiff, hold him in the subway station, and hold and process him at the police station when, in fact, he had violated no law" gives rise to an inference that there was a mutual understanding to deprive Humphrey of his Fourth Amendment rights. For their part defendants claim there was no agreement before the fact, so that they cannot be held liable.

Humphrey has the better of that argument. He presents evidence—his own deposition testimony—that after Staszak arrested him, Staszak explained to Demitro and Neuffer that he was arresting Humphrey for his attempt to "be a good Samaritan" (Humphrey Dep. 101–02) and that they went along with Humphrey's arrest by participating as Humphrey was detained and booked. Staszak and Demitro both participated in the decision as to the charges to be filed against

Humphrey (Humphrey Dep. 45–46; Staszak Dep. 30–32), and there is also some evidence that Neuffer participated (Humphrey Dep. 45–46; Staszak Dep. 30–32) or was at least in the vicinity (Neuffer Dep. 29) when that conversation took place.

Moreover, in the present climate in which Humphrey's version of events must be believed, it becomes highly probative that the stories told by Staszak, Demitro and Neuffer are virtually identical. That virtual identity could readily be perceived by a rational factfinder as the product of mutual fabrication and thus as strong evidence of a continuing conspiracy. Because a reasonable jury could thus find that Staszak, Demitro and Neuffer engaged in a conspiracy to arrest Humphrey without probable cause, a conspiracy continuing into the present by a coverup as was true in *Hampton,* their Rule 56 motion must be denied in that respect.

 Again Pajowski presents a different situation. Unlike the other three defendants, Pajowski was not present when any of the events surrounding Humphrey's arrest occurred. In fact, he did not find out that Humphrey had been arrested until Humphrey was already handcuffed and down in the subway. According to Pajowski, he was told only a bare bones story about Humphrey's arrest—he claims Staszak and Demitro told him only that Humphrey had interfered with Kelly's arrest (Pajowski Dep. 17–18)—and thus he had no reason to know that anything fishy was going on.

Humphrey counters by pointing out that Pajowski was present while Humphrey was being detained and processed in the subway and at the police station (H. Mem. at 8). But according to Pajowski he did not even see Humphrey until Humphrey already had been arrested (Pajowski Dep. 12, 17–18), and he had nothing but Staszak's and Demitro's story to act on. Nothing in the record suggests that Pajowski knew Humphrey's arrest was a sham. Thus his assistance in detaining and processing Humphrey amounted to nothing other than doing his job. Because Humphrey has provided no evidence to tie Pajowski to the putative conspiracy, Pajowski's motion for summary judgment on the conspiracy claim must be granted.

*Conclusion*

Defendants' motion for summary judgment is granted in part and denied in part. There are no genuine issues of material fact, and defendants are entitled to a judgment as a matter of law, as to:

1. all of Humphrey's claims against Pajowski;

2. his equal protection claims against Staszak and Neuffer; and

3. his Section 1985(3) conspiracy claims against Staszak, Demitro and Neuffer.

Defendants' motion is denied as to:

4. Humphrey's false arrest claims against Staszak, Demitro and Neuffer;

5. his equal protection claim against Demitro; and

6. his Section 1983 conspiracy claim against Staszak, Demitro and Neuffer.

No Rule 54(b) determination of partial finality has been requested by defendants, and none is called for here. Although such a determination could be appropriate as to Pajowski (see *National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)), under the circumstances of this case no useful purpose would be served by rendering his dismissal as a defendant final (and hence appealable).